Argued and submitted April 25, 1996, reversed and remanded in part on appeal; reversed and remanded with instructions in part on cross-appeal; otherwise affirmed on appeal and cross-appeal May 28, 1997

Colin D. AINSLIE,
Samuel Anderson, Michael Berovic, Joan L. Betts,
Trustee of the Frank E. Betts Marital Trust and
the Frank E. Betts Family Trust,
Thomas L. Blair, Rochelle M. Blair,
Raymond Brady, C.A. Christensen,
Richard D. Cohon, David S. Davies,
Alice Davies, David A. Frankenfield,
David P. Gambee, Frederick Hallwyler,
Richard L. Hay, Douglas C. Jensen,
Roland H. Jensen, Ronald Kirkpatrick,
Marilyn A. Lane, Richard L. Lemke,
Martha Lemke, Terry R. Lock, Joseph Mandiberg,
Richard Meloy, William C. Moak,
Michael Noonan, Marvin Ommert,
Herbert Ormsby, Dona M. Ormsby,
Franklin R. Oswald, Donald E. Petersen,
Dennis Russell, Arthur Todd, and Leland Waltuck,
*Appellants - Cross-Respondents,*

*v.*

FIRST INTERSTATE BANK OF OREGON, N.A.,
an Oregon banking corporation,
*Respondent - Cross-Appellant,*

*and*

SECURITY PACIFIC BANK OREGON,
formerly known as The Oregon Bank,
an Oregon banking corporation,
*Defendant.*

FIRST INTERSTATE BANK OF OREGON, N.A.,
an Oregon banking corporation,
*Third-Party Plaintiff,*

*v.*

CLASSIC CHRISTMAS TREE ASSOCIATES,
an Oregon limited partnership,
*Third-Party Defendant.*

(9009 05735; CA A82128)

939 P2d 125

John W. Stephens, Michael J. Esler and Kim T. Buckley argued the cause for appellants - cross-respondents. With them on the briefs was Esler, Stephens & Buckley.

Jeffrey M. Batchelor argued the cause for respondent - cross-appellant. With him on the brief were James H. Clarke,

Richard H. Williams, Dian R. Rogers and Lane Powell Spears Lubersky.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DEITS, P. J.

**DEITS, P. J.**

Plaintiffs appeal and defendant First Interstate Bank (First Interstate)[1] cross-appeals from the judgment for plaintiffs in this action for breach of fiduciary duty, breach of contract, violation of the Oregon Securities Law, ORS chapter 59, and violation of the Oregon Racketeer Influenced and Corrupt Organization Act (ORICO). ORS 166.715 to ORS 166.735. The action arose out of First Interstate's handling of funds that it held in escrow in connection with a securities offering in which plaintiffs were investors. We affirm in part and reverse in part on both the appeal and the cross-appeal.

Plaintiffs purchased limited partnership units in Classic Christmas Trees Associates (Classic), pursuant to an offering that was registered with the Oregon Corporation Commissioner[2] (Commissioner) on December 10, 1985. The registration was to expire one year later. The business objective of the venture was to farm and market Christmas trees. Classic's principal prospective opportunity for engaging in that business at the time that it was conceived and planned was an existing Christmas tree farm, owned by James Heater and his family and operating under the name "Silver Valley." Heater was instrumental in the formation of Classic. At the time of Classic's formation, Heater's existing business was indebted, was operating at a loss and was unable to obtain further needed financing. Market conditions and other factors were such that no imminent improvement in that picture was anticipated.

Six months before the offering was registered, Heater hired Leonard DuBoff, an attorney, to provide legal advice and organizational assistance. DuBoff, in turn, engaged Timber Management, Inc., a company owned and managed by James Spoylar, to act as Classic's general partner. DuBoff's law firm prepared the documents in which the

---

[1] Plaintiffs settled with the other named defendant, The Oregon Bank, and it is not a party to this appeal. The present case relates to the same transaction as the one giving rise to the actions and appeal addressed in *Ainslie v. Spoylar*, 144 Or App 134, 926 P2d 822 (1996), *rev allowed* 324 Or 654 (1997).

[2] The functions of that office are now performed by a different agency, but we refer to the responsible officials as of the time of the relevant events.

terms of the offering were set forth. Among the terms were the following: (1) 40 units would be sold for $45,500 each, generating a total of $1,820,000; (2) prospective purchasers would be required to pay the full unit price at the time of their subscriptions, but the subscriptions would be subject to acceptance by the general partner, Timber Management, and would not constitute purchases unless accepted or until the other terms set out below were fulfilled; (3) the subscription proceeds would be held in escrow; (4) in the event that subscriptions and payments for all 40 units were not received and accepted before the offer or the registration terminated, the units would not be sold and the subscription payments would be returned to the subscribers; and (5) funds were not to be distributed or used for other purposes, including the initiation of Classic's business venture, until $1,838,394[3] had been raised and an "escrow under OAR 815-36-045 has been established in that amount." The terms were spelled out in a "private placement memorandum" and, later, in subscription agreements with the investors. Copies of those documents were furnished to First Interstate after it became the escrow agent.

The Commissioner accepted the offering registration, subject to those terms and subject to the agency's rule then codified at OAR 815-36-045.[4] That rule provided, in relevant part:

"(2)  An escrow must be established where, because of the nature of the intended use of the funds, nature of the project or business plan, a minimum amount of funds must be raised in order that the project can get underway with a reasonable chance of success even if no further sales are made.

"(3)  Where an escrow is required:

"(a)  The escrow agent must be an institution licensed to conduct banking, savings and loan, trust or other escrow activities or a licensed professional whose requirements of licensure requires the segregation of funds of others into

---

[3] The part of that amount that exceeded the necessary subscription payments represented the general partner's contribution.

[4] The rule is now codified, in materially similar part, as OAR 441-65-160.

fiduciary trust accounts but it cannot be the issuer or a promoter of an issuer to be formed;

"(b) The escrow terms must include instructions that the funds placed into escrow shall be held in trust for the benefit of the investors and shall not be released to registrant until the minimum amount of funds set forth in the application for registration has been raised."

Pursuant to the Commissioner's requirements and OAR 815-36-045, Timber Management, the general partner, entered into an escrow agreement with First Interstate. The agreement was executed on December 23, 1985, and provides, as material:

"The Partnership [Classic] has registered a private offering of its limited partnership units ('Units') with the Corporation Commissioner of the State of Oregon pursuant to provisions of Oregon Administrative Rule 815-Division 36. The Partnership desires that the net proceeds to the Partnership from the sale of such Units be held in escrow until the amount of $1,820,000.00 in cash has been placed on deposit with the Escrow Agent. The parties therefore agree as follows:

"1. FUNDS TO BE PLACED IN ESCROW

"On or after the date of execution of this Agreement, all funds received from the sale of the Units subject to this Escrow Agreement shall be paid to the Escrow Agent and deposited by the Escrow Agent in an escrow account. During the term of this Escrow Agreement, the Partnership shall cause all checks received by it in payment for the Units to be either payable to the Escrow Agent or endorsed forthwith to the Escrow Agent.

"2. SUBSCRIPTION AGREEMENTS

"The Partnership shall cause to be delivered to the Escrow Agent a signed counterpart of each Subscription Agreement which shall contain, among other things, the name and address of each subscriber, the date and amount subscribed, and the amount paid, or in the alternative, shall furnish to the Escrow Agent with each deposit of funds in the escrow a list of the persons who have subscribed the money and executed the notes, showing the name, address, date, amount of subscriptions and amount of money paid and notes executed.

### "3. DUTY OF ESCROW AGENT

"The sole duty of the Escrow Agent, other than as hereinafter specified, shall be to receive such funds and hold them, subject to release, in accordance with these written instructions. The Escrow Agent shall be under no duty to make certain that the Partnership is complying with requirements of its Partnership Agreement in tendering to the Escrow Agent the proceeds of the sale of Units.

### "4. RELEASE OF FUNDS

"When the Escrow Agent has on hand not less than $1,820,000.00 in cash, the Escrow Agent shall promptly notify Leonard D. DuBoff, Attorney at Law, (503) 295-6260 by telephone of the fact that such amount has been received. Upon receipt by the Escrow Agent of telephone authorization from Leonard D. DuBoff, the Escrow Agent, on demand of the Partnership, shall pay over to the Partnership all funds remaining in the escrow account, including interest thereon. If the conditions mentioned above are not met prior to the expiration of this Agreement, then the Escrow Agent shall refund to each subscriber at the address appearing on the Subscription Agreement or list of subscribers or at such other address as shall be provided to the Escrow Agent in writing, all sums paid by him pursuant to his subscription without interest. In the event that a Subscription Agreement is in the name of a husband and wife, upon the death of either, the Escrow Agent may pay over any subscription funds to which they are entitled to the survivor.

### "5. DURATION AND TERMINATION

"This escrow shall terminate on December 30, 1985, unless extended by the Partnership. In the event of termination, the Escrow Agent shall disburse the funds in the escrow account in the manner and upon the terms described in Paragraph 4 above. The Partnership has full authority, however, to abandon the sale of Units at any time prior to December 30, 1985. Upon receipt of a copy of an amendment to the Partnership's Certificate and Agreement of Limited Partnership stating that the

sale of the Units has been abandoned, prior to December 30, 1985, and duly attested by the General Partner, the Escrow Agent is then authorized to refund the moneys received from the subscribers as provided in paragraph 4 above.

"6.  TERMINATION BY REVOCATION OR SUSPENSION

"If at any time prior to the completion of this Escrow the Escrow Agent is advised by the Corporation Commissioner of the State of Oregon that authorization to sell the Units has been suspended or revoked, the Escrow Agent shall promptly return all funds to the respective subscribers as provided in Paragraph 4 above.

"7.  LIMIT OF ESCROW AGENT'S RESPONSIBILITY

"It is expressly understood between the parties that, in consideration of FIRST INTERSTATE BANK OF OREGON, N.A. acting as Escrow Agent, the bank is to be considered and held as a depository only and shall not be responsible or liable in any manner whatsoever for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited in this escrow, nor as to the identity or rights of any person executing the same. It is also understood that the Bank assumes no responsibility, nor is it to be held liable as to the condition of the title of any of the property involved herein, nor as to any assessments, liens or encumbrances against the property and that its duties under this Agreement shall be limited to the safekeeping of such money, instruments or other documents received by it as Escrow Agent, and for the delivery of the same in accordance with the written escrow instructions given to it in this Agreement.

"* * * * *

"11.  ESCROW AGENT'S LIABILITY

"In addition to the provisions of Paragraph 7 above, the Escrow Agent's obligations and duties in connection herewith are confined to those specifically enumerated in this Agreement. The Escrow Agent shall not be in any manner liable or responsible for

the sufficiently [*sic*] correctness, genuineness or validity of any instruments deposited with it or with reference to the form of execution thereof, or the identity, authority or rights of any person executing or depositing same, and the Escrow Agent shall not be liable for any loss that may occur by reason of forgery, false representation or the exercise of its discretion in any particular manner or for any other reason except its own negligence or willful misconduct."

The agreement was signed by Spoylar, on behalf of Timber Management, and by an assistant vice president and trust officer, Alice Garrett, for First Interstate. Timber Management extended the offering and the escrow a number of times, with the last expiration due to expire on August 30, 1986. The apparent reason for the extensions was that subscriptions to the units were much slower in coming than had been hoped.

In the meantime, Heater's financial situation became increasingly precarious. By August 1986, Key Bank, Heater's principal creditor, was threatening to foreclose on part of the Heater-Silver Valley business property. Because the Classic subscriptions and escrow were still underfunded, they could not permissibly be used to provide Heater with needed financial assistance. The other side of the coin, of course, was that Heater's property and business—the main or sole source of Classic's prospective Christmas tree operations—were in jeopardy.

Despite the fact that the subscriptions were more than one million dollars short of the $1,820,000 required before disbursement of the escrowed funds could permissibly occur, Classic's principals arrived at a plan to solve or circumvent that problem. They arranged for the Oregon Bank and First Interstate to make offsetting debits and credits against each bank's "correspondence account" with the other, in amounts equal to the difference between $1,820,000 and the currently paid investor subscriptions in the escrow. Their notion was that that would nominally bring the escrow balance up to the amount required for disbursement, even though no additional money would actually be exchanged or

would actually come to rest in the escrow account except as a transitory fiction.

First Interstate's representative, Garrett, expressed reservations about the plan, but eventually agreed to it, and it was implemented on August 15, 1986. After preliminary conversations took place on that day, an associate of DuBoff's sent Garrett a confirming letter. It noted:

> "To the extent that the instructions set forth herein represent an amendment to the Proceeds Escrow Agreement, this correspondence has been co-signed by James Spoylar, President of Timber Management, Inc., the General Partner."

The letter proceeded to direct First Interstate to make the offsetting entries to the Oregon Bank's correspondence account and to disburse the funds actually in the escrow account, *i.e.*, those obtained from investor subscription payments, principally to Silver Valley. First Interstate acted in accordance with those directions.

A "second escrow" was then established with First Interstate by Classic, pursuant to a putative second escrow agreement.[5] On approximately December 31, 1986, the escrow became "fully funded" through investor subscriptions.[6] Thus, although the full required level of funding was eventually reached, independently of the credit and debit transfers between the two banks, there are at least three facts to be noted about the antecedent disbursement history: (1) no return of the investments was made to subscribers upon the August 30 expiration of the last extension to the original agreement, although the escrow was not fully funded by that date; (2) no return of investments was made by December 10, when the registration of the offering expired; and (3) the August 15 disbursement from the underfunded

---

[5] Our subsequent references to the escrow agreement will continue to be to the *original* agreement, except where we specify otherwise. Those references accord with our conclusion that the original agreement contained the requirements that First Interstate was legally required to follow, both before and after August 15.

[6] We understand both parties' briefs to state that the required funding level *was* reached when the last investor payment was made in December. *How* the escrow was made whole after the August misallocation is a matter of some dispute, but not one that we need to address.

escrow account to, *inter alia,* Silver Valley was contrary to the instructions in the original escrow agreement, the conditions of the registration, and the requirements of OAR 815-36-045.[7]

At the end of 1986, after the required funding level was achieved, First Interstate disbursed the funds in the escrow account to Classic for its operational use. Thereafter, First Interstate had nothing further to do with Classic, at least in any ways relevant to this case. Approximately one and one-half years later, Classic failed, as the result of market and business contingencies—including mismanagement—that post-dated First Interstate's acts and involvement in the relevant events. Plaintiffs lost most of their investments. They brought this action in September 1990, seeking damages for their investment losses and punitive damages, and contending that First Interstate's August 15 disbursement of the escrowed funds before the escrow was funded to the required level was the cause of plaintiffs' losses.

Although the case was tried to a jury, many of the critical issues were decided by the trial court as a matter of law and were communicated to the jury through peremptory instructions. The central dispute between the parties, at trial and on appeal, concerned the role in which First Interstate acted and the extent to which the substantive requirements of OAR 815-36-045 applied to First Interstate. First Interstate took the view that it was plainly and simply an escrow agent, obliged only to act in accordance with the instructions of the Classic principals, and that the requirements of the cited rule governed Classic's conduct, but not its own. Plaintiffs' view was essentially the opposite; they asserted that, pursuant to the Commissioner's rule and the escrow agreement, First Interstate was required to hold the escrowed funds in trust for the benefit of the investors, pending the prerequisites to disbursement and subject to the disbursement directives and limitations set forth in the original escrow agreement. Summarily stated, plaintiffs' position was that First Interstate owed them a fiduciary duty with respect

---

[7] The legal issues that follow from these facts, insofar as the parties' arguments raise them, will be discussed below.

to the maintenance of the escrow and the funds it held, while First Interstate's position was that it had no duties that were fiduciary in kind and owed no duties of any kind to the investors.

The trial court agreed generally with plaintiffs. Consequently, the court instructed the jury, in accordance with its understanding of OAR 815-36-045, that a fiduciary or trust relationship existed between the investor plaintiffs and First Interstate for purposes of the fiduciary duty claim. Similarly, the court struck First Interstate's defenses to the contract claim, based on the liability disclaimers in the escrow agreement, because it concluded that those defenses were at odds with the requirements of OAR 815-36-045 and the trust relationship between the parties mandated by that rule. On the securities law claim, the court instructed the jury that First Interstate was a material aider or participant in the sale of the Classic securities as a matter of law, but sent to the jury the defense that First Interstate did not and could not reasonably have known the existence of the facts on which Timber Management's and the other Classic principals' liability was based. ORS 59.115(3).[8] Plaintiffs' theory of liability in their two ORICO claims[9] was that First Interstate caused their damage through "predicate offenses" consisting of securities law crimes and misapplication of entrusted property in connection with the escrow. All factual questions regarding liability and damages on the ORICO claims went to the jury.

The jury found First Interstate liable on all five claims. On the fiduciary duty claim, it awarded compensatory damages of $1,214,384 and punitive damages in an equal amount. The jury also awarded the same amount as compensatory damages on the contract claim. On the securities law claim, the jury awarded $1,576,200 in compensatory damages, as it also did on the ORICO claims. In addition, it awarded almost five million dollars in punitive damages for

---

[8] *See* note 16. We will refer to the text of the statutes in ORS chapter 59 and the ORICO statutes as they read at the time of the relevant events.

[9] The ORICO claims were plaintiffs' fifth and sixth, as pleaded, and we will refer to them as such where separate references are necessary. We note, in the interest of clarity, that there are only three other claims that remain germane.

the ORICO violations. After tripling the compensatory ORICO award pursuant to ORS 166.725(7), the trial court merged the compensatory damages on the other claims into that figure, to allow for a single compensatory award equal to the trebled ORICO damages. The court then added the punitive damages on the fiduciary duty claim to the ORICO punitive damages. Additionally, the court awarded plaintiffs their costs and, on the statutory claims, also allowed them attorney fees. Plaintiffs appeal and First Interstate cross-appeals from the resulting judgment. Because the principal issues arise in the cross-appeal, we will address it first. Before doing so, however, we will provide some preliminary observations that may add to the clarity of the discussion that follows.

The principal theme of First Interstate's argument is that, because it was an escrow agent, it could not be accountable for the events here and, more particularly, was not and could not be subject to or responsible for implementing or violating OAR 815-36-045. That theme is the major premise of First Interstate's arguments regarding the fiduciary duty, contract and securities law claims and also finds its way to a lesser extent into First Interstate's ORICO arguments. Because First Interstate regards the trial court's disagreement with it on that overriding point to be the dominant basis for the court's adverse rulings on the claims other than ORICO, First Interstate has combined the first ten of its 16 assignments for argument, even though the assignments themselves pertain specifically to rulings that relate directly to three separate claims.

First Interstate is entitled to do that.[10] *See* ORAP 5.45(6). However, its doing so does not change the fact that the three claims *are* different, and must be viewed differently, to the extent that the common basis for reversal that First Interstate urges is not independently dispositive of all the claims. Because much of our opinion will be devoted to a discussion of First Interstate's arguments, which tend to lump the claims together, it is important to emphasize certain differences among the claims at this point, from the

---

[10] We note, however, that there is a problem with trying to put all of one's eggs in the same basket, in addition to the problem that that practice generally calls to mind: Some of the things that one puts in the basket may not be eggs.

standpoint of what *plaintiffs* had to show to establish liability.

On the fiduciary duty and contract claims, the necessary showing was that First Interstate (or its agents) *itself* engaged in culpable conduct, and that *that* conduct caused damage to plaintiffs. On the securities law claim, conversely, plaintiffs proceeded on the theory that First Interstate was a "participant" or a party that "materially aided" in the sale. Consequently, on that claim, derivative liability could be established under ORS 59.115(3), based on a showing that First Interstate acted in one or both of those capacities, and that the *seller* (*i.e.*, Classic or its active principals or participants) committed *some* violation of the securities laws in connection with the sale, with resulting damage to plaintiffs. In other words, First Interstate would not *have* to be directly culpable, nor would *its* conduct have to be the cause of damage, in order for it to be liable under ORS chapter 59.[11]

In connection with the ORICO claims, the questions again become whether First Interstate's or its agents' own conduct was culpable and was the cause of damage. However, those questions become more complicated than they might otherwise be, where the ORICO claim is joined with a securities law claim and the alleged "predicate offenses" giving rise to the ORICO claim are related to the activities that, for purposes of the securities claim, are relied on to support a showing of derivative liability.[12] First Interstate's principal argument to us on the ORICO claims is that plaintiffs failed to prove that First Interstate's conduct was the cause of their

---

[11] As we suggested in a somewhat different connection in *Computer Concepts, Inc. v. Brandt*, 137 Or App 572, 581 n 5, 905 P2d 1177 (1995), *rev den* 323 Or 153 (1996), this does *not* mean that the conduct is *necessarily nonculpable*, in fact: It means only that proof of direct culpability was not *essential* in order to establish securities law liability under a participant or material aider rationale.

As noted above, ORS 59.115(3) establishes a "lack of knowledge" defense for nonsellers. Although the parties make arguments regarding that defense, they do not require discussion separate from other arguments that we do discuss.

[12] The discussion in the preceding paragraphs in the text is meant to provide an overview of the relationship among the various claims in the case. It does not purport to provide a detailed statement of the legal standards for liability, as distinct from the *basic* similarities and dissimilarities in the showings that are required to make out the different claims. More detailed analyses of the legal standards, as they become necessary, will appear below in the contexts to which they pertain.

damage. First Interstate does not make that argument in connection with the other claims, *see* note 22, but contends for other reasons that the adverse judgment on those claims should be reversed.

■     Against that background, we turn to First Interstate's assignments of error on the cross-appeal. The first ten turn wholly or largely on the principal thesis of First Interstate's argument that we have described.[13] Although the parties make numerous secondary arguments aimed at supporting or bolstering their views of the issue, the central premises

---

[13] As summarized in the Table of Contents to First Interstate's brief, the specific assignments of error are:

"CROSS-ASSIGNMENT OF ERROR NO. 1

"THE COURT ERRED IN DENYING FIOR's [First Interstate's] MOTION FOR DIRECTED VERDICT ON PLAINTIFFS' FIDUCIARY DUTY CLAIM, BECAUSE FIOR WAS NOT PLAINTIFFS' FIDUCIARY AS A MATTER OF LAW ...............................................................

"CROSS-ASSIGNMENT OF ERROR NO. 2

"THE COURT ERRED, IN CONNECTION WITH THE FIDUCIARY DUTY CLAIM, IN INSTRUCTING THE JURY THAT FIOR WAS A FIDUCIARY WHO OWED PLAINTIFFS A DUTY OF 'UTMOST CARE AND TRUST' NOT TO RELEASE ESCROW FUNDS 'UNTIL A MILLION EIGHT HUNDRED THOUSAND DOLLARS OF INVESTOR FUNDS HAD BEEN RECEIVED'......................................................

"CROSS-ASSIGNMENT OF ERROR NO. 3

"THE COURT ERRED, IN CONNECTION WITH FIOR'S AFFIRMATIVE DEFENSE TO THE SECURITIES CLAIM, IN INSTRUCTING THE JURY THAT FIOR WAS IN 'A RELATIONSHIP OF TRUST WITH THE PLAINTIFFS'................................................................

"CROSS-ASSIGNMENT OF ERROR NO. 4

"THE COURT ERRED, IN CONNECTION WITH THE FIDUCIARY DUTY AND BREACH OF CONTRACT CLAIMS, IN STRIKING FIOR'S AFFIRMATIVE DEFENSE THAT ITS DUTIES AND RESPONSIBILITIES WERE DEFINED AND LIMITED BY THE TERMS OF THE PROCEEDS ESCROW AGREEMENT .................................................

"CROSS-ASSIGNMENT OF ERROR NO. 5

"THE COURT ERRED, IN CONNECTION WITH THE FIDUCIARY DUTY CLAIM, IN REFUSING FIOR'S REQUESTED INSTRUCTIONS THAT ITS DUTIES AND RESPONSIBILITIES WERE LIMITED BY THE TERMS OF THE PROCEEDS ESCROW AGREEMENT...............

"CROSS-ASSIGNMENT OF ERROR NO. 6

"THE COURT ERRED, IN CONNECTION WITH THE BREACH OF CONTRACT CLAIM, IN INSTRUCTING THE JURY TO DISREGARD LANGUAGE IN THE PROCEEDS ESCROW AGREEMENT THAT LIMITED FIOR'S DUTIES AND RESPONSIBILITIES............................

of their positions are *relatively* straightforward. First Interstate asserts that it was an escrow agent and, as such, it was responsible only to hold the escrowed funds, subject to the disbursement instructions of Classic's general partner, Timber Management, and that it had no duty—fiduciary or otherwise—to the investors. First Interstate relies on the escrow agreement and on numerous cases that support that view of the nature of an escrow agent's role, as a general proposition. In particular, First Interstate relies on our statement in *McDonald v. Title Insurance Co. of Oregon*, 49 Or App 1055, 1059, 621 P2d 654 (1980), *rev den* 290 Or 727 (1981):

> "[T]he existence of a [fiduciary] duty cannot be based upon [the] defendant's role as an escrow agent * * *. An escrow holder, by definition, is a neutral party with no obligation to either party to the transaction except to carry out the terms of the escrow instructions."

Plaintiffs respond that *this* escrow arrangement was not governed by that general principle, but was instead subject to OAR 815-36-045 (sometimes hereafter the "rule"), which required the escrowed funds to "be held in trust for the benefit of the investors" until the specified amount of funding

---

"CROSS-ASSIGNMENT OF ERROR NO. 7

"THE COURT ERRED IN DENYING FIOR'S MOTION FOR DIRECTED VERDICT ON PLAINTIFFS' SECURITIES CLAIM, BECAUSE FIOR DID NOT PARTICIPATE OR MATERIALLY AID IN THE SALE OF CLASSIC SECURITIES AS A MATTER OF LAW.............................

"CROSS-ASSIGNMENT OF ERROR NO. 8

"THE COURT ERRED, IN CONNECTION WITH THE SECURITIES CLAIM, IN GRANTING PLAINTIFFS' MOTION FOR PARTIAL DIRECTED VERDICT THAT FIOR WAS A 'PARTICIPANT' OR 'MATERIAL AIDER' IN THE SALE OF CLASSIC SECURITIES....................

"CROSS-ASSIGNMENT OF ERROR NO. 9

"THE COURT ERRED, IN CONNECTION WITH THE SECURITIES CLAIM, IN INSTRUCTING THE JURY THAT FIOR, AS A MATTER OF LAW, PARTICIPATED AND MATERIALLY AIDED IN THE SALE OF CLASSIC SECURITIES.........................................................

"CROSS-ASSIGNMENT OF ERROR NO. 10

"THE COURT ERRED, IN CONNECTION WITH THE SECURITIES CLAIM, IN REFUSING FIOR'S REQUESTED INSTRUCTION THAT WOULD HAVE PERMITTED THE JURY TO CONSIDER WHETHER FIOR PARTICIPATED OR MATERIALLY AIDED IN THE SALE OF CLASSIC SECURITIES......................................................."

was obtained. Therefore, plaintiffs contend, based on the requirements of the rule, First Interstate had and breached a fiduciary or trust duty in releasing escrowed funds to an entity other than the investors before the required funding level had been reached.

First Interstate answers that the rule applies to *sellers*, issuers and the like, such as Classic's principals, not to the escrow agents whom the sellers hire, and that the escrow agreement between First Interstate and Timber Management bears out that allocation of responsibility by absolving First Interstate of virtually all possible liability and accountability. In turn, plaintiffs respond that the rule explicitly requires the escrow *terms* to embody the rule's substantive mandates, by specifying that escrowed funds are to be held in trust for the investors, pending the receipt of the required funding.

As noted above, OAR 815-36-045(3)(b) provides:

> "The escrow terms must include instructions that the funds placed into escrow shall be held in trust for the benefit of the investors and shall not be released to registrant until the minimum amount of funds set forth in the application for registration has been raised."

Plaintiffs reason that this regulatory requirement is a rule of law, which prevails over anything to the contrary in the contract. They also maintain that the fact that the rule requires the escrow terms and contracts to contain the specified provisions further demonstrates that the rule does apply to escrow agents, who are as much parties to and subject to escrow terms and contracts as are the parties with whom they contract to provide escrow services.[14]

---

[14] Plaintiffs bolster their argument by reference to cases holding that insurance policies are "deemed to include" statutorily-required provisions that the policies omit. First Interstate notes that the two cases plaintiffs cite for that principle involved policies that omitted required terms that were adverse to the insureds. First Interstate then asserts that the principle has no application to statutory *coverage* requirements that an insurer's policy omits or purports to exclude.

First Interstate is incorrect. In *Dowdy v. Allstate Insurance Co.*, 68 Or App 709, 685 P2d 444, *rev den* 298 Or 172 (1984), for example, we applied the principle to a policy that purported to exclude coverage required by the Financial Responsibility Law. We explained that, because the exclusion was contrary to the "language of the law" requiring coverage, "the policy therefore 'automatically provide[s] such coverage, regardless of its terms.' *Snyder v. Nelson/Leatherby Ins.*, 278 Or 409,

We agree with plaintiffs. To begin with, First Interstate's starting assumption, that all escrow agents are the same and subject to the same limited responsibilities and duties, is far too simplified. It is clear that an entity *can* act as an escrow agent and simultaneously play other or supplemental roles in connection with the same arrangement or transaction and, therefore, be subject to the duties and legal standards that pertain to those roles. *See, e.g., In re Bauer*, 283 Or 55, 581 P2d 511 (1978) (attorney who acts as escrow for the parties to a transaction *and* provides legal representation to one of the parties is subject to professional ethical standards).

Relatedly, it is equally apparent here that OAR 815-36-045 applies, at the least, to the escrow *arrangements* that the rule requires in connection with this type of securities sale. First Interstate does not really dispute that, but maintains that the rule cannot apply to *escrow agents*, because the regulations and duties it imposes are not consistent with the role of an escrow agent as usually understood. At its core, First Interstate's reasoning is that escrow agents are *per se* not fiduciaries and, although the rule expressly requires the escrowed funds to be held in trust for the investors' benefit, that fiduciary requirement cannot be directed at escrow agents, because they are not fiduciaries. The problem with that reasoning is that it begins and ends with a label and disregards the substance in the middle, *i.e.*, the terms of the rule.

It is important to understand that, although OAR 815-36-045 refers to the arrangement that it requires as an "escrow," it does not use that term in the sense or establish an arrangement of the kind that the term normally connotes. The rule's purpose and substance require that an escrow be created when necessary to assure that investment funds not be used for purposes of a business venture unless and until a

---

414, 564 P2d 681 (1977)." *Dowdy*, 68 Or App at 717. It is self-evident that the principle relied on by plaintiffs applies to omitted terms that the law requires a policy to contain, regardless of which party they benefit. *See Cambron v. North-West Ins. Co.*, 70 Or App 51, 55, 687 P2d 1132 (1984), *rev den* 298 Or 470 (1985). In any event, the principle aside, it is also self-evident that the conduct of the parties to an agreement is subject to legal requirements that govern their dealings with one another and with others, whether or not they have contracted to obey the law.

requisite minimum amount of funding is raised. In keeping with that objective, the rule requires certain escrow terms that differ significantly from usual escrow arrangements. It expressly provides that the effective depositor and planned ultimate recipient of the funds, the seller, may not obtain their release or, implicitly, direct their disbursement in ways that vary from the rule's own conditions for disbursement. Additionally, the rule expressly requires that a trust relationship exist and that it be for the benefit of persons other than the depositor or intended recipient—*i.e.*, the investors.

We do not agree with First Interstate's thesis that, although *escrows* established pursuant to the rule differ in those most fundamental of respects from the prototype "traditional" escrow, the *escrow agent* itself is to perform the same limited role with the same limited responsibility and accountability as that of the "mere stakeholder" in the "traditional" escrow arrangement. As we read the rule, the escrow agent is an essential barrier between the investor funds and the access to the funds that the rule prohibits the seller from having, and the rule makes that role one of trust on the investors' behalf.

First Interstate's contention that the rule and the fiduciary relationship under it pertain only to sellers and other principals, but not escrow agents, is at complete odds with the critical role that the agent plays in carrying out the essential purpose of the rule. It is also contrary to the unmistakable import of the rule's language, which states that the funds subject to it "shall be held in trust for the benefit of the investors." The only entity that *holds* funds under the rule is the escrow agent. It defies logic that the rule could mean that the only entity that does or can hold funds pursuant to it does not have the duty of trust with which the rule requires the funds to be held. Similarly, the language of the rule is contrary to First Interstate's contention that, unlike the prototype escrow agent, it has no direct responsibility for how the funds are disbursed. The rule requires that the funds not be released to the registrant until the prescribed conditions for their release are satisfied. Just as the escrow agent is the only entity that holds funds, it is the only one which can release them. Accordingly, the rule cannot be read, as First

Interstate does, as making the limitations on the escrow agent's distribution of funds contingent on the contrary instructions of the very entity to whom the rule provides that the funds may not be distributed.

■    Finally, the passive role that First Interstate understands the rule to assign to escrow agents in carrying out the foregoing requirements cannot be squared with the rule's further mandate that those requirements be made a part of the terms of the escrow arrangement to which the escrow agent is *ipso facto* a party. We conclude that the rule requires and creates a fiduciary or trust relationship between the investors and the escrow agent, as well as between them and the seller.

In addition to its primary argument regarding the fiduciary duty issue, which we have rejected, First Interstate makes a number of secondary arguments, some of which call for discussion. First, First Interstate relies on the terms of the escrow agreement as both bolstering its understanding of the rule's limited application (or nonapplication), and as diminishing its duties and limiting its potential liability independently of the rule.

We note first that we do not share First Interstate's apparent presuppositions about the extent to which its original agreement with the general partner deviates from the rule, even assuming that the agreement *could* effectively do so. The recital in the agreement specifically refers to OAR "Rule 815-Division 36," and paragraph 4 describes conditions for the release of funds that are wholly consistent with the requirements of the rule and the registration conditions approved by the Commissioner. Moreover, paragraph 3 makes it one of the escrow agent's duties to assure that the receipt and release of funds shall accord "with *these* written instructions." (Emphasis supplied.) The agreement does not provide that First Interstate may act on subsequent instructions from Timber Management, the general partner, that are inconsistent with the distribution terms and conditions in the agreement itself.

Be all of that as it may, however, the short answer to First Interstate's argument is that any provisions of the

agreement that are contrary to the requirements of the rule, including the contractual limitations on liability, are subordinate to the rule's provisions, which constitute requirements of law. *See* note 14. For the reasons we have given, the rule precludes any contractual attempt by First Interstate to reduce its duties and accountability to plaintiffs below the fiduciary levels that the rule requires and, also, requires the escrow terms themselves to specify.

■    First Interstate further argues that, consistent with *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), we must construe the rule in light of its context as well as its text. First Interstate asserts that the context of the rule is contrary to plaintiffs'—and our—reading of it, because the contextual statutes and rules pertaining to securities regulation rarely refer to escrows or escrow agents. However, context is a two-edged sword. The fact that escrow requirements and regulations are not often to be found elsewhere in the statutes and rules makes it more graphic and significant that they *are* included in *this* rule, and that the rule very plainly indicates that and why escrow arrangements, which are not generally required by the securities laws and regulations, are required in *particular* circumstances of the kind involved here. The context in no way points to a conclusion different from the one that the text calls for when the circumstances where an escrow is required *are* present.

■    First Interstate argues next that, were the rule to be read as plaintiffs and we do, it would effectively create a privately actionable "regulatory tort," which the Oregon appellate courts have said (more usually by use of the term "statutory tort") the *courts* should be loathe to do. However, we do not understand the effect of the rule or of our holding to be the *creation* of a regulatory tort or of any kind of judicial remedy that does not already exist. Rather, the rule simply provides that entities in the position of First Interstate *have* a duty of a kind whose *breach* has long since been redressable at common law.

First Interstate also maintains that escrows are regulated pursuant to ORS chapter 696 and, accordingly, the Commissioner's rule implementing ORS chapter 59 should

not be understood as a regulation of escrows or escrow agents. This argument basically restates First Interstate's principal theme that an entity acting as an escrow agent cannot be or be subject to regulation as anything but an escrow agent, regardless of any role or functions that the entity performs simultaneously that go beyond those of a mere depository or stakeholder. We reject this argument for the same reasons that we have rejected First Interstate's other contentions it bases on the same thesis.[15]

We conclude that OAR 815-36-045 placed First Interstate in a trust relationship with plaintiffs. The trial court did not err in so instructing the jury. There was no error affecting the jury's finding or the judgment on the fiduciary duty claim and, accordingly, we affirm this aspect of the judgment on the cross-appeal.

First Interstate's arguments bearing on the contract claim are materially indistinguishable from those we have addressed—or found it unnecessary to address—in the preceding discussion. In any event, the damages that were awarded on the contract claim duplicated and were subsumed within the compensatory award on the fiduciary duty claim. The contract claim has no independent dispositive effect in the judgment, and no factors are present that necessitate separate discussion of or attention to that claim. *See Dynagraphics, Inc. v. U.S. National Bank of Oregon*, 100 Or App 108, 110, 785 P2d 760, *rev dismissed* 310 Or 120, 792 P2d 439 (1990).

■ Among the first ten assignments that First Interstate has grouped for argument in the cross-appeal, some relate directly to the securities law claim. Insofar as First Interstate supports those assignments with the same arguments as those we have discussed—and, in the main, it does—we again reject them. However, some additional considerations arise in connection with First Interstate's further contention that whether it participated in or materially aided

[15] ORS 59.115(4), pertaining to the potential liability of purely "ministerial" escrowees and similar functionaries under the securities law, was enacted after the relevant events occurred. Or Laws 1991, ch 762, § 1. We agree with plaintiffs that it is inapplicable here. Moreover, First Interstate's passing reference to it shows no way in which it might alter the analysis.

the sale, within the meaning of ORS 59.115(3), was a question of fact for the jury, and the court therefore erred by effectively directing a partial directed verdict against First Interstate on those questions.[16] We reiterate that the substantive legal issue under this claim, unlike those in all of the other claims, did not *require* plaintiffs to make a showing of direct wrongdoing by First Interstate (at least in the sense that the conduct would be directly actionable independently of the statute). Liability premised on a defendant's status as a participant or one who materially aids in a sale can be derivative from the unlawful activities of the seller or other principals in the sale.

The corollary is that liability under the applicable part of ORS 59.115(3) requires no showing by plaintiffs that First Interstate knew of the illegality that inhered in the transaction, although the statute makes a form of lack of knowledge an affirmative defense. *See Prince v. Brydon,* 307 Or 146, 150, 764 P2d 1370 (1988). Rather, the cases have emphasized that liability as a participant or a provider of material aid depends on the extent and importance of the defendant's involvement. *Id.; Ainslie v. Spoylar,* 144 Or App 134, 144-45, 926 P2d 822 (1996), *rev allowed* 324 Or 654 (1997). As the Supreme Court explained in *Prince,* in the context of a claim against a lawyer who provided legal services in connection with a securities transaction:

> "Whether one's assistance in the sale is 'material' depends on the importance of one's personal contribution to the transaction. Typing, reproducing, and delivering sales documents may all be essential to a sale, but they could be performed by anyone; it is a drafter's knowledge, judgment, and assertions reflected in the contents of the documents that are 'material' to the sale." 307 Or at 149.

■ A final introductory point is that, although proof of direct unlawful activity by a defendant or its participation in the seller's unlawful acts themselves, as distinct from the

---

[16] ORS 59.115(3) provides, as relevant:

"[E]very person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of the facts on which the liability is based."

sale generally, is not *essential* to establish its liability as a participant or material aider, proof of that kind can nevertheless be *relevant* to the question; the extent and importance of the defendant's *involvement* in a sale can be shown by evidence of its connection with unlawful activities as much as with any other aspects of the sale. *See* note 11; *Ainslie,* 144 Or App at 144-45.

We turn to the parties' arguments. Apart from its moorings in the ongoing theme that an escrow agent can be responsible for nothing, First Interstate provides no particularization for its argument that there was evidence here from which a jury could rationally find that First Interstate was not a participant or material aider. Plaintiffs suggest, apparently as a general proposition, that the legal test contemplated in *Prince* turns on gradations that are far from subtle (*e.g.*, draftsmanship versus stenography), and that the evidence concerning the nature of a defendant's involvement in particular cases will generally be fairly clear-cut; therefore, the questions of participation and material aid will often, if not usually, be appropriately resolved by a directed verdict or summary judgment.

Without reaching the broader aspects of that proposition, we agree that the evidence *here* was conclusive that First Interstate participated in or materially aided the sale. In *Ainslie,* a case arising out of the same transaction, we affirmed the summary judgment against the defendant lawyer and concluded that he materially aided the sales as a matter of law. We explained:

> "Defendant was deeply involved in the August 15 events, which led to the use of investor money to prevent the Silver Valley foreclosure that would at the least have seriously impeded the offering. He continued to provide legal services to Classic for the offering from then until after its completion." 144 Or App at 145.

First Interstate was at least equally involved in the August 15 events and in the use and misuse of investor funds. Also, as in *Ainslie,* First Interstate's involvement continued thereafter, in the form of establishing and managing the replacement "second escrow," the existence and uses of which were byproducts of and necessitated by the misuse of the first.

Even assuming that First Interstate's role up to August 15 was the passive one it suggests, that status ceased on August 15 and was never restored until the funds were finally distributed in December and First Interstate's involvement with Classic ended. Until then, as a matter of law, it participated in and materially aided the sale and the unlawful activity itself. The trial court did not err by instructing the jury accordingly.[17] We reject First Interstate's contrary argument, along with the other arguments supporting its first ten assignments.

■ In its eleventh assignment of error, First Interstate argues that the court erred by denying its motion for a directed verdict on the ground that the securities law claim was barred by the statute of limitations. ORS 59.115(6) provides, as material:

> "Except as otherwise provided in this subsection, no action or suit may be commenced under this section more than three years after the sale. An action under this section for a violation of paragraph (b) of subsection (1) of this section or ORS 59.135 may be commenced within three years after the sale or two years after the person bringing the action discovered or should have discovered the facts on which the action is based, whichever is later."

It appears to be agreed that the action was not brought within the three-year period and that the trial court's denial of the motion was based on its conclusion that the two-year discovery provision applies instead. First Interstate argues that the claim against it was based on ORS 59.115(3), not ORS 59.115(1)(b) or ORS 59.135, and that the trial court was accordingly in error. Plaintiffs answer that their allegations of unlawful activity against the Classic sellers and principals included acts that violated ORS 59.135; therefore, the extended two-year discovery provision was applicable to First Interstate as a party whose alleged liability was derivative from that of the sellers. The question here is functionally identical to the one presented in *Anderson v. Carden*, 146

---

[17] It is unclear to us whether the ruling took the form of a partial directed verdict, or simply amounted to a peremptory instruction. The difference is inconsequential for purposes of our review.

Or App 675, 934 P2d 562 (1997), and our answer there accords with plaintiffs' argument.

■    First Interstate's remaining assignments relate to the ORICO claims. Because it is wholly dispositive of those claims, we reach only its argument that the trial court erred by denying its motion for a directed verdict, as to both the fifth and sixth claims, on the ground that plaintiffs did not prove that their damage was caused by First Interstate's alleged ORICO violations.

ORS 166.725(7)(a) makes civil liability under ORICO contingent on proof that the plaintiff suffered damage "by reason of" the defendant's violations of ORICO. At trial, the ORICO violations that plaintiffs contended resulted in the loss of their investments arose out of or were related to the impermissible August 15, 1986, release of the funds from escrow. Plaintiffs' specific theory of the cause of their damage was aptly summarized by the trial court's instruction to the jury:

> "Plaintiffs have to prove that they were injured as a result of First Interstate Bank of Oregon's commission of some racketeering act in order to recover on the racketeering claim.
>
> "If you find that, but for First Interstate's commission of one or more racketeering crimes, that an investor would have withdrawn from making his investment in Classic or that the Classic offering would have been withdrawn or failed; then the racketeering crime would be a cause of plaintiffs' damage."[18]

According to First Interstate, plaintiffs' proof showed that, rather than resulting from any earlier events, plaintiffs' loss was ultimately caused by market dynamics and the mismanagement of Classic, after Classic was an operating business and substantially after the funds had *finally* been distributed by First Interstate to Classic at the

---

[18] In the colloquy between court and counsel regarding the instructions and the parties' exceptions, the trial judge sought to verify that plaintiffs' only theory of causation was whether the "omission [*sic*] cause[d] the investment to be made." After plaintiffs' attorney made an affirmative response, the court added:

"If it did not, then that's the end of your case, you're out[?]"

Counsel answered, "Right."

end of 1986. First Interstate asserts that plaintiffs' proof of the cause of damages was insufficient under federal decisions applying the federal analog of ORICO, which First Interstate argues we should follow. According to First Interstate, the federal courts have required a form of "proximate cause" standard to prove RICO damages, but plaintiffs' theory and proof here rested on a putatively lower threshold of "but for" causation at the best. More simply stated, First Interstate contends that plaintiffs' proof could show only that their damage resulted from Classic's ultimate collapse and that the link between First Interstate's conduct and that event was not sufficient to allow recovery under the test of causation that First Interstate maintains we should apply.

Plaintiffs disagree with First Interstate's legal premise, but maintain that, even assuming its correctness and applicability, the proximate cause formulation that First Interstate endorses requires only what amounts to a showing of "foreseeability" that corresponds to what the Oregon courts have required in negligence cases. In its turn, First Interstate appears not to accept plaintiffs' legal premise but, assuming its correctness nevertheless, First Interstate asserts that plaintiffs' proof showed only that the ultimate collapse of Classic and loss of the investments resulted solely from the after-the-fact independent misfeasance of "third parties," *i.e.*, the Classic management, which was not foreseeable by First Interstate as a matter of law. First Interstate concludes that, under *Allstate Ins. Co. v. Tenant Screening Services, Inc.*, 140 Or App 41, 914 P2d 16 (1996), and *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993), plaintiffs did not show the requisite foreseeability *or* connection between First Interstate's acts and plaintiffs' loss.

Without necessarily agreeing with either its terminology or its legal theses, we agree with First Interstate's conclusion.[19] It is arguable that, had First Interstate not released the funds on August 15, 1986, and had it returned the funds to the investors on August 30 or on December 10, as it was required to do, plaintiffs might not have remained

---

[19] We note generally that our discussion under this assignment assumes but does not decide the correctness of the parties' specific legal theories that are not essential to their arguments or our disposition.

investors and Classic might have died aborning. It is also possible that, had plaintiffs brought an action on or shortly after any of those dates, asserting their present claims and their present theory of damages, their present proof would have sufficed. However, under the circumstances that *do* exist and under plaintiffs' theory of damages, their proof supports nothing but speculation. By the time that the ultimate distribution was made from First Interstate to Classic after the last subscription was received in December 1986, the venture was funded in the manner and to the extent required.[20] It is simply an imponderable whether plaintiffs might have desisted from being Classic investors in response to earlier events that did not occur. The *fact* is that they remained Classic investors after any damages that might have resulted from those events had been fully mitigated, and their loss was caused by later events with which First Interstate had no connection, *i.e.*, Classic's failure as an ongoing business in 1988.[21]

Plaintiffs also appear to argue *now* that the premature release of investor funds from the escrow, conjoined with First Interstate's concomitant failure to return the investor funds in August or early December, was *itself* a loss to them, leaving aside its effect on their investment choices and Classic's immediate survival. Assuming that we can address that argument, which appears not to have been made below, the answer to it is the same as the answer to the previous argument. Any loss that plaintiffs arguably suffered in 1986 was cured by later events, and their damages actually resulted from events that occurred later still after First Interstate was out of the picture and in which it was not involved in any way that could tenably be understood as causal.

---

[20] *See* note 6.

[21] Plaintiffs do not argue, nor did their proof show, that First Interstate's mismanagement of the escrow had any lingering effect on the amount of their loss that persisted after the end-of-the-year distribution. There is nothing to show, for example, that they would have received less than a full return if they had sold their shares on January 1, 1987, or that they would have received less then than if First Interstate had refunded their investments in August or early December of the previous year.

Plaintiffs also contend that, even under First Interstate's proximate cause theory, they demonstrated foreseeability and, therefore, under their own theory, a sufficient causal connection between First Interstate's activities and the eventual loss that followed from the collapse of Classic. Plaintiffs explain, *inter alia*, that First Interstate knew that Spoylar and the other principal Classic participants were "schemers," desperate for funds and, for other reasons, unlikely to meet with success in business.

Be that as it may, it can establish no causal relationship between First Interstate's misconduct and the later failure of Classic from which plaintiffs' loss resulted. Plaintiffs confuse predictability with foreseeability. Any awareness that First Interstate might have had about general problems with the character or business acumen of persons associated with Classic cannot supply a cognizable connection, causal or otherwise, between First Interstate's violation of the escrow requirements and the managerial shortcomings and failure of Classic that occurred long after and had no relationship to any events in which First Interstate was involved. *See SAIF v. Montgomery*, 108 Or App 93, 99, 814 P2d 536 (1991), *rev den* 312 Or 589 (1992); *Fortney v. Crawford Door Sales Corp.*, 97 Or App 276, 280, 775 P2d 910 (1989). We hold that plaintiffs failed to prove that First Interstate's acts or omissions caused plaintiffs' damages and that the trial court therefore erred by denying First Interstate's motion for a directed verdict on the ORICO claims.[22]

■    We turn to the appeal. Plaintiffs contend in their first assignment that the court erred by offsetting settlement payments from other defendants against the principal amount of the judgment first, rather than against the accrued interest. Plaintiffs are correct. *Ainslie*, 144 Or App at 145-47; ORS 59.115(2)(a).

In their second assignment, plaintiffs assert that the court erred in the way that it computed their attorney fees on the ORICO claims. Our disposition of those claims on the cross-appeal has the effect of vacating that award, and the

---

[22] First Interstate makes no assignment or argument to us that it was entitled to a directed verdict on any of the other claims for the same reason that it was entitled to a directed verdict on the ORICO claims.

assignment is academic. So, too, are plaintiffs' remaining assignments, each of which ascribes error to the court's ORICO instructions. Those assignments are moot in light of our holding that plaintiffs failed to prove the claims.

On appeal, reversed and remanded for entry of an amended judgment in accordance with this opinion; on cross-appeal, judgment for plaintiffs on ORICO claims reversed and remanded with instructions to dismiss claims and for entry of an amended judgment not inconsistent with this opinion; otherwise affirmed on appeal and on cross-appeal.