Argued and submitted May 24, vacated and remanded with instructions on appeal; affirmed on cross-appeal October 16, 1996, petition for review allowed February 11, 1997 (324 Or 654)

Coln D. AINSLIE,
Samuel Anderson, Michael Berovic, Joan L. Betts,
Trustee of the Frank E. Betts Marital Trust
and the Frank E. Betts Family Trust,
Thomas L. Blair, Rochelle M. Blair, Raymond Brady,
C.A. Christensen, Richard D. Cohon,
David S. Davies, Alice Davies,
David A. Frankenfield, David P. Gambee,
Frederick Hallwyler, Richard L. Hay,
Douglas C. Jensen, Roland H. Jensen,
Ronald Kirkpatrick, Marilyn A. Lane,
Richard L. Lemke, Martha Lemke, Terry R. Lock,
Joseph Mandiberg, Richard Meloy,
William C. Moak, Michael Noonan,
Marvin Ommert, Herbert Ormsby, Dona M. Ormsby,
Franklin R. Oswald, Donald E. Petersen,
Dennis Russell, Arthur Todd and Leland Waltuck,
*Appellants - Cross-Respondents,*

*v.*

James J. SPOLYAR,
Evergreen Tree Corporation,
Timber Management, Inc.,
James Heater, Maurice C. Heater, Shirley K. Heater,
Joseph McMenamin, Babener & Carpenter,
Leonard Duboff, Niemi, Holland & Scott,
Daniel Mueller, David Hackett, and
American Surety Company,
*Defendants,*

*and*

Michael McARTHUR-PHILLIPS,
*Respondent - Cross-Appellant,*

*and*

Steven COOPER,
Investment Capital Corporation
and Robert Kehoe,
*Respondents.*

(8912-07730; CA A82127)

926 P2d 822

Michael J. Esler and Kim T. Buckley argued the cause for appellants - cross-respondents. With them on the briefs were John W. Stephens and Esler, Stephens & Buckley.

R. Alan Wight argued the cause for respondent - cross-appellant Michael McArthur-Phillips. With him on the briefs were William B. Crow, James N. Westwood and Miller, Nash, Wiener, Hager & Carlsen.

No appearance by Respondent Steven Cooper.

No appearance by Respondent Investment Capital Corporation.

No appearance by Respondent Robert Kehoe.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Plaintiffs purchased limited partnership units in Classic Christmas Trees Associates (Classic), an Oregon limited partnership. Defendants allegedly sold the units or participated in or materially aided the sales. Plaintiffs now seek to rescind their purchases under ORS 59.115(2)(a) on the ground that the units were sold in violation of the Oregon Securities Law (the Law) or of a condition, limitation, or restriction imposed on registration under the Law. They appeal from a summary judgment in their favor, arguing that the trial court incorrectly calculated the amount of prejudgment interest.[1] Defendant Michael McArthur-Phillips (defendant), a lawyer who was involved in organizing the partnership, cross-appeals, arguing that the trial court erred in entering judgment against him. We vacate and remand on the appeal and affirm on the cross-appeal.

Classic's purposes were to acquire, plant, grow, and market Christmas trees and to provide a tax shelter for its limited partners.[2] It offered 40 limited partnership units to investors under an exemption from federal securities registration requirements. Plaintiffs are the subscribers to 37 of the 40 units. Defendant Timber Management, Inc., was the general partner of Classic; defendant James J. Spolyar was Timber Management's sole owner. Defendant Leonard DuBoff was the lead attorney in organizing Classic; defendant, who was admitted to the bar in 1982, was an associate in DuBoff's firm.

Defendant began working on the offering in mid-November 1985, replacing another associate who had left the

---

[1] Plaintiffs' judgment is against defendants Leonard DuBoff, Michael McArthur-Phillips, James Spolyar, Evergreen Tree Corporation, Timber Management, Inc., Steven Cooper, Investment Capital Corporation, and Robert Kehoe. DuBoff has filed a Chapter 13 bankruptcy and is not a respondent to the appeal. Of the other defendants, only McArthur-Phillips, Cooper, Investment Capital Corporation, and Kehoe are named as respondents and only McArthur-Phillips has appeared in this court. Our decision on the appeal applies to all respondents.

[2] Because the court granted plaintiffs' motion for summary judgment, we state all facts most favorably to defendant, drawing all inferences in his favor. ORCP 47 C; *Stoeger v. Burlington Northern Railroad Co.*, 323 Or 569, 572, 919 P2d 39 (1996); *Mittleman Properties v. Bank of California*, 131 Or App 666, 668, 886 P2d 1061 (1994).

firm. His immediate responsibilities included preparing the final version of the offering memorandum and a number of related documents, including the application to register the units with the Oregon Corporation Division, and conferring with others involved in preparing the offering. He continued to be involved with the offering thereafter, including assisting at least one subscriber in financing his subscription and participating in actions that we describe below.

The offering was originally scheduled to terminate in January 1986, but delays in obtaining subscribers to all 40 units led to several amendments to the offering memorandum that extended the time to August 30, 1986. The general partner purported to have accepted subscriptions to all 40 units on August 15, but full payment on all units did not occur until December 31, 1986. The registration for the offering with the Corporation Division expired on December 10, 1986.

Under the terms of the offering memorandum, a person who wished to subscribe to a partnership unit had to execute a number of papers and pay the full capital contribution of $45,500 at the time of subscribing. The subscription did not, in itself, constitute the purchase of a partnership unit. Rather, the money from subscriptions was to be placed in an escrow at First Interstate Bank of Oregon (FIOR) until all of the conditions for selling the units were met. Those conditions included the provisions described below and the general partner's decision to accept a particular subscription.

The offering memorandum provided that, if subscriptions for the full 40 units were not received and accepted before the offering terminated, "none of the Units will be sold and all cash subscription funds * * * will be returned within 10 days thereafter * * *." The partnership agreement, which all subscribers signed, provided that a person became a limited partner upon the general partner's acceptance of a subscription agreement, accompanied by proof of delivery of the *full* capital contribution to the escrow agent. The subscription agreement also included a representation that the subscriber was transmitting the full capital contribution to the escrow agent.[3] Thus, payment of the full capital contribution

---

[3] Most investors borrowed the money for their subscriptions. As a result, most did not make the full capital contribution until some time after they executed the subscription documents.

was essential for a subscription to be complete, while there could be no sale of any unit to anyone until there were completed, fully paid, subscriptions to all 40 units.

The escrow agreement provided that FIOR would release the funds, upon authorization from DuBoff, when it had at least $1,820,000 on hand in cash, an amount that represented full payment for the 40 limited partnership units. The offering memorandum described the intended use of those funds and of the general partner's contribution of $18,384. Most of the money was intended for purchasing and operating the Christmas tree plantations; the rest was designated for costs and commissions related to creating the partnership and selling the units.

Classic proposed to purchase cutting rights and other interests from Silver Valley, Ltd. (Silver Valley), another limited partnership. However, Silver Valley had large outstanding bank loans that the bank was threatening to foreclose, thus placing its continued control over its property at risk and threatening the Classic transaction. On August 15, 1986, when the threatened foreclosure appeared imminent, the escrow contained only $794,060 in investor funds, one million dollars less than the amount needed to close. In an attempt to make those limited funds immediately available to Silver Valley despite the lack of 40 fully paid subscriptions, Classic arranged for a transaction between FIOR and The Oregon Bank that nominally put sufficient money in the FIOR escrow, thereby justifying FIOR in releasing the funds. Defendant prepared the necessary instructions, and both he and Spolyar signed them. At the same time Timber Management, as Classic's general partner, purported to accept subscriptions to 40 units and to reject subscriptions to seven and one-half units.

In accordance with the instructions that defendant prepared, FIOR and The Oregon Bank made paper adjustments to their correspondence accounts with each other. The Oregon Bank credited FIOR's account with $1,035,880, which FIOR credited to the escrow. FIOR then credited The Oregon Bank's account with FIOR in the same amount, deducting it from the escrow.[4] Based on that fleeting credit

---

[4] It appears that FIOR entered its credit and debit in the afternoon of August 15, while The Oregon Bank did not enter its credit until after the close of business

and debit to the escrow, Classic and FIOR decided that they had satisfied the requirement that the escrow contain $1,820,000 before any distribution. FIOR then distributed the investor funds that really were in the escrow. The bulk went to Silver Valley; of the rest, $12,070 went to refund deposits from the rejected subscribers, while The Oregon Bank received $4500 for its assistance. According to the instructions, Classic was to receive anything left over.[5]

Classic treated this transaction as fulfilling the conditions of the. offering memorandum and began business operations. It nevertheless continued to receive payments on previous subscriptions, placing most of them in a second escrow. Under pressure from Silver Valley it often paid out those amounts shortly after they came in.

The final capital contribution to the offering did not occur until December 31, 1986, when one investor completed payment on his subscription to one half unit.[6] That payment, unlike the others, did not go through the second FIOR escrow. Neither the first nor the second escrow contained $1,820,000 in cash derived from investors at any one time.

Classic was not profitable, and plaintiffs filed this action on December 29, 1989, seeking, among other things, to rescind the transaction under ORS 59.115, on the ground that the securities were not registered at the time of sale. During discovery they learned facts that, they believed, gave rise to securities, fraud, and ORICO claims against FIOR and The Oregon Bank in addition to the claims that they had brought against the defendants in this case. They then filed a

---

on that day. FIOR thus gave the Classic escrow account a credit before it had actually received any money for the purpose.

[5] The total payments appear to exceed the investor funds actually in the escrow. The parties do not discuss this point, and we do not consider it further.

[6] Defendant points out that the relevant plaintiff's affidavit does not state the precise day in December on which he made his final payment. In his deposition, however, that plaintiff implicitly treats December 31 as the correct date. A letter from the stockbroker who sold the units indicates that only 37$\frac{1}{2}$ units were complete as of December 16, 1986, while letters to and from defendant in late January 1987 state that the offering was fully funded on December 31, 1986. There is no contrary evidence in the record, and defendants did not make an issue of this point in the trial court. We conclude that the only evidence is that the final payment was made on that date.

separate action against the banks. The cases were assigned to the same trial judge and consolidated for trial.

The trial court granted summary judgment to plaintiffs against defendant on his liability long before the trial but deferred entering judgment until the cases were concluded. Most of the other claims in both cases were also resolved before trial through summary judgment, settlement, default, or dismissal. Only the claims against FIOR actually went to trial, resulting in a verdict for plaintiffs that is the subject of a separate appeal currently pending in this court. After that trial, the court entered separate judgments in each case.

In entering judgment in this case, the court allocated plaintiffs' settlements with other defendants among the various claims that plaintiffs made against the settling parties. Because those claims included alleged fraud and ORICO violations, the court allocated part of the settlements to the punitive damages and treble damages that would have been available under those claims. It thus allocated only a portion of the settlements to the damages that plaintiffs could recover against the respondents listed in footnote 1 under the securities claim. After making that allocation, the court credited the portion of the settlement payments that it allocated to the claims against respondents first to reduce the principal amount of the claims and then to reduce the interest. Because plaintiffs are entitled to prejudgment interest only on the principal of their claims, not on previously accrued prejudgment interest, the result was to reduce the amount of the ultimate judgment against respondents by approximately $200,000.[7]

We first consider the issues on defendant's cross-appeal, because they go to the heart of the case. Defendant challenges the trial court's grant of summary judgment to plaintiffs on their claim under ORS 59.115(3). That provision makes a person who participates in or materially aids the sale of a security in violation of the Law or of any condition of

---

[7] This figure is based on plaintiffs' calculations; it is irrelevant to this opinion whether it is correct. The trial court on remand will need to determine the correct amount. These settlements that we describe are relevant solely to the arguments on plaintiffs' appeal concerning prejudgment interest.

registration liable to the purchaser to the same extent as the seller. Under ORS 59.115(2), as it existed at the relevant times, the purchaser was entitled to recover the consideration that it paid for the security together with interest, costs and attorney fees; the parties raise no issues concerning the court's award of costs or attorney fees.[8]

Defendant's first three assignments of error all involve the date on which plaintiffs purchased their units. The assignments are (1) that the trial court erred in ruling that ORS 59.115(6), the statutory limitations period for an action under ORS 59.115, does not begin to run from the date that a plaintiff has committed to purchase a security but from the last possible date that an event related to the purchase could have occurred; (2) that the trial court erred in ruling that the statutory limitations period does not run separately as to each purchaser but instead commences as of the date of the last act of the last purchaser; and (3) that the trial court erred in ruling, as a matter of law, that the securities were sold in violation of the Law.

Defendant treats these issues as involving questions of statutory interpretation that are applicable to all issues of when a sale occurs and when the limitiations period begins running under the Law. He thereby gives the trial court's rulings a broader significance than that court intended or than the case requires. As the trial court recognized, the answers to the issues that defendant raises do not come from the general policy of the securities laws but from the specific terms of this offering.

The essential question on these three issues is when Classic sold the units to plaintiffs. Under ORS 59.115(6), plaintiffs had three years from the date of the sale to bring these claims. The first two assignments of error expressly raise the issue of when the sales occurred for limitations purposes. The third issue also turns on when the sale occurred; if, as plaintiffs argue and the trial court held, Classic sold the units after the registration expired, the sale violated the

---

[8] The 1995 legislature amended the statute to provide for a discretionary award of attorney fees to the prevailing party. ORS 59.125(10); Or Laws 1995, ch 696, § 9.

Law, and a person who participated in or materially aided the sale would be liable to the purchaser. ORS 59.115(1), (3).

The Law does not expressly determine when a sale occurs in these circumstances. ORS 59.015(15) defines "sale" and "sell" to include a number of kinds of agreements or transfers, but it does not establish when any of those agreements or transfers occurs. Defendant, citing cases from other jurisdictions, argues that a sale occurs when the purchaser commits to buy, not when it makes the last of a series of installment payments. Plaintiff cites cases that suggest a contrary conclusion. However, the answer in this case does not depend on a general rule but on the terms of the offering memorandum and related documents.

The Classic offering expressly provided that it was an "all or nothing" offering. There would be no sale unless there were completed subscriptions to all 40 units. Thus, the sale of any one unit could not occur until the sale of all units occurred. The essential question, thus, is when a subscription became complete. Unlike some of the cases on which defendant relies, a subscription to the Classic offering was not complete when the subscriber filled out the necessary forms and made a down payment. Rather, it was complete only when the subscriber delivered the full $45,500 capital contribution to the escrow agent; however other offerings might be structured, *this* offering did not permit installment payments. In addition, this was not a case in which units were sold over a period of time, the sale occurring as to each when the subscription became complete. Although plaintiffs signed the subscription documents at different times and paid capital contributions over an extended period, the offering memorandum did not permit the general partner to accept any of those subscriptions, or to use any of the capital contributions, until it was able to accept every subscription and to use all of the capital contributions.

The conditions that allowed Classic to sell the units and to use the capital contributions did not occur until December 31, 1986, when the final payment was made on the last half unit. Until that date, the general partner did not have the power to accept *any* subscriptions; thus, under the terms of the offering memorandum, its purported acceptance

of subscriptions in August could not be not effective until the date of the final payment. Before December 31, *all* subscriptions were simply offers to purchase units; on that date they became actual purchases. The sale of all units, therefore, occurred on December 31.

Defendant argues that the August 15 events fulfilled the conditions of the offering memorandum and constituted the sale, except for those plaintiffs who thereafter purchased their units from original subscribers who were unable to complete their commitments. We agree that the general partner's decision, as part of the August 15 events, to accept certain subscriptions and to reject others may have determined who became a purchaser of the units on December 31. Beyond that, the events had no legal effect. The fleeting deposit into and withdrawal of money from the escrow did not satisfy the conditions of the offering memorandum, the escrow agreement, or any other relevant document. That money did not come from the subscribers, nor was it available for use in the partnership's business. The money was not used for the purposes described in the offering memorandum but simply went back into The Oregon Bank's coffers if, indeed, it can ever be said to have left them.

Because, under the express conditions in the offering memorandum, the sale of all units occurred on December 31, 1986, and because plaintiffs filed this case on December 29, 1989, within three years of that date, defendant's assignments of error concerning the statute of limitations fail. Because the registration with the state expired on December 10, 1986, the sale of all units occurred at a time that they were not registered. The sales therefore violated the Law, and plaintiffs had the right provided in ORS 59.115(2) to rescind them.

■    Defendant's final assignment of error is that the trial court erred in holding that he participated in or materially aided the sales of partnership units to plaintiffs. He argues primarily that DuBoff played the major role in preparing the offering documents and that a subordinate attorney cannot be held liable as a matter of law under the criteria discussed

in *Prince v. Brydon,* 307 Or 146, 764 P2d 1370 (1988). Defendant ignores that, whether or not his work on the initial offering constituted participating in or materially aiding the sales, his later activities clearly did.

Defendant was deeply involved in the August 15 events, which led to the use of investor money to prevent the Silver Valley foreclosure that would at the least have seriously impeded the offering. He continued to provide legal services to Classic for the offering from then until after its completion. He thereby materially aided the sales. There is no issue of fact on the affirmative defense of lack of knowledge. Defendant undoubtedly acted with knowledge of the facts that made the sale illegal; it was not necessary that he be specifically aware of the illegality. *Prince,* 307 Or at 150. For these reasons, we affirm the trial court on defendant's cross-appeal.

We turn to plaintiffs' appeal concerning the calculation of prejudgment interest. They argue that ORS 59.115(2)(a) clearly provides that they are entitled to interest on the full amount of the judgment and that, therefore, the trial court should have used the settlement amounts to reduce accrued interest before using them to reduce the principal amounts owed. The statute provides that, upon tender of the security, a purchaser may recover

> "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgments and decrees for the payment of money or the rate provided in the security if the security is an interest-bearing obligation, less any amount received on the security * * *."

The statute does not expressly provide for the application of partial payments that are not "received on the security." It would not violate the statutory language to apply partial payments either first to accrued interest or first to principal. In either case the purchaser could be said to have received interest on the consideration from the date of payment. The difference in the two approaches is when the principal is deemed to be reduced so that it accrues less interest. Neither party suggests that there is any relevant legislative history on this point.

When the legislature adopted ORS 59.115(2), Oregon had a clear rule for applying partial payments to an interest-bearing obligation. In *First Nat. Bank v. Courtright*, 82 Or 490, 158 P 277, 161 P 966 (1917), the Supreme Court stated that it follows the "United States rule" and quoted Chancellor Kent's explanation in *Connecticut v. Jackson*, 1 Johns Ch (NY) 13, 17-18 (1814):

> " 'The rule for casting interest, where partial payments have been made, is to apply the payment, in the first place, to the discharge of the interest then due. If the payment exceeds the interest, the surplus goes toward discharging the principal, and the subsequent interest is to be computed on the balance of principal remaining due. If the payment be less than the interest, the surplus of the interest must not be taken to augment the principal; but interest continues on the former principal until the period when the payments, taken together, exceed the interest due, and then the surplus is to be applied toward discharging the principal, and interest is to be computed on the balance as aforesaid.' " 82 Or at 499.

■ This rule applies to calculating interest under ORS 82.010, and the reference to that statute in ORS 59.115(2) may suggest that the same rule applies here. In any case, the context of ORS 59.115(2) includes the United States rule, and there is no indication that the legislature intended a different result. We generally construe statutes in light of the existing law. *See, e.g.*, *Swarens v. Dept. of Rev.*, 320 Or 326, 333, 883 P2d 853 (1994) (legislature presumed to know of prior enactments); *Simpson v. First Nat. Bank*, 94 Or 147, 157-58, 165, 185 P 913 (1919) (construing Negotiable Instruments Act in light of the law merchant.) The trial court should have applied the United States rule when it entered the judgment in this case.

Defendant's arguments in support of the trial court's decision do not really discuss the issues that plaintiffs raise; defendant never even mentions the United States rule. Rather, his arguments attempt to shift the focus to what he asserts is the unfairness of allowing other defendants to settle with plaintiffs for relatively small amounts, leaving defendant, who he says was a junior associate acting under the

instructions of a senior attorney, primarily liable for plaintiffs' claims. The underlying problem with this attempted shift of focus is that the proper calculation of prejudgment interest has nothing to do with whether the effect of the settlements on defendant is fair or with whether the court has any ability to review that effect to ensure that it is fair.

Defendant argues, first, that plaintiffs are entitled to only one satisfaction for each injury. That rule is not in dispute; the issue is how to calculate the amount of that single satisfaction.[9] Second, he argues that applying this rule would undercut his right to contribution from other defendants by permitting plaintiffs to make cheap settlements with favored defendants, bar his right of contribution against those defendants, and escalate their recovery against him and other nonsettling defendants. Whether or not the settlements that other defendants made with plaintiffs bar defendant's potential contribution claim against those defendants is not the issue. Rather, the question is how to determine the amount of the judgment that would be the basis for defendant's contribution claim, if he has one. Finally, defendant cites several cases that, he asserts, support his position. Those cases, one of which the United States Supreme Court reversed, do not have the effect that defendant claims for them.

Defendant also makes three cross-assignments of error, attacking (1) the trial court's allocating part of the settlements to punitive damages, (2) its entry of an order barring defendant's contribution rights, and (3) its alleged failure to control the fairness of the settlements by requiring offsets to the final judgment based on proportional fault. A cross-assignment of error is proper when the respondent believes that the trial court erred in some intermediate ruling and that, if the appellant is successful, the judgment on appeal is sustainable by reversing or modifying that intermediate ruling. The purpose of a cross-assignment, thus, is to support the judgment on a different ground. ORAP 5.57(2);

---

[9] The punitive and ORICO damages that plaintiffs sought against FIOR are, of course, separate from the rescissory recovery to which they are entitled in this case. Any such damages that plaintiffs ultimately receive will not affect their right to the damages that they recovered against defendant.

*see Artman v. Ray*, 263 Or 529, 532-34, 501 P2d 63, 502 P2d 1376 (1972).

The issue of defendant's contribution rights cannot affect the amount of the judgment against defendant but only his ability to require others to share in the liability for that judgment. It is not, therefore, a proper cross-assignment of error and we do not consider it further. The other two cross-assignments might reduce the judgment against defendant, thereby offsetting the effect of our ruling in plaintiff's favor on the pretrial interest issue. We reject them on the merits.

The trial court did not abuse its discretion in allocating part of one settlement to potential punitive damage claims against the settling defendant. *Cf. Ertsgaard v. Beard*, 97 Or App 471, 478-79, 777 P2d 971 (1989), *aff'd* 310 Or 486, 800 P2d 759 (1990) (allocation of settlement under ORS 18.455 is for court).[10] Finally, we are not aware of any requirement in this context that the court review a settlement with one defendant for its fairness to other defendants. Any rights of contribution that may arise from such a settlement are matters among the defendants; they do not affect the correct amount of the judgment in favor of the plaintiffs.

On appeal, vacated and remanded with instructions to enter judgment in accordance with this opinion; affirmed on cross-appeal.

---

[10] We do not decide whether ORS 18.455 applies directly to a claim for rescission under the securities laws; it is sufficiently analogous to suggest the appropriate rule of law for this issue.