Argued and submitted January 21, affirmed April 28, 1999

# WELLS FARGO & COMPANY
## and First Interstate Bank of Oregon, N.A.,
### *Appellants,*

*v.*

# INDUSTRIAL INDEMNITY COMPANY,
### *Respondent.*

## (960604180; CA A98825)

980 P2d 1138

Jeffrey M. Batchelor argued the cause for appellants. With him on the briefs were Lee C. Nusich, Dian S. Rubanoff, and Lane Powell Spears Lubersky.

Daniel F. Mullin argued the cause for respondent. With him on the brief were Angela M. Stewart and Abbott, Davis, Rothwell, Mullin & Earle, P.C.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Plaintiffs Wells Fargo & Company and First Interstate Bank of Oregon, hereafter referred to jointly as First Interstate,[1] initiated this action against defendant insurer Industrial Indemnity Company (Industrial) after Industrial denied coverage on one of First Interstate's claims. The claim concerned First Interstate's liability for mismanaging certain escrow accounts. The underlying facts concerning First Interstate's handling of some of these escrow accounts are discussed at length in our opinions in *Ainslie v. First Interstate Bank*, 148 Or App 162, 939 P2d 125 (1997), and *Ainslie v. Spoylar*, 144 Or App 134, 926 P2d 822 (1996), *rev allowed* 324 Or 654 (1997), and need not be repeated here. The only question on appeal is whether First Interstate had escrow "errors and omissions" coverage under Industrial's umbrella liability insurance policy. Both parties moved for summary judgment. The trial court allowed Industrial's motion and denied First Interstate's motion. First Interstate appeals, arguing that the trial court erred in denying its motion for partial summary judgment and in granting defendant's motion for summary judgment. We affirm.

On review of cross-motions for summary judgment, we examine whether there are any disputed issues of material fact and whether either party was entitled to judgment as a matter of law. *Atlantic Richfield Co. v. Greene*, 100 Or App 16, 19, 784 P2d 442 (1989), *rev den* 309 Or 698 (1990). Most of the facts relevant to plaintiff's claims and defendant's defenses are not in dispute. Where the facts are disputed, we state them in the light most favorable to First Interstate.

During part of the time the escrow problems leading to the underlying claims occurred, Industrial provided First Interstate with excess insurance in the amount of $4 million, over and above the $1 million provided by First Interstate's primary Farmers Insurance policy and a second Mid Century policy. The Farmers policy provided, in pertinent part:

---

[1] Wells Fargo purchased First Interstate in 1996, well after the events at issue in this case. Our other cases concerning the same underlying subject matter all refer to the bank involved as First Interstate. Therefore, we do the same in this opinion.

"It is agreed that the company will pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon it by law * * * for damages arising from error, neglect or omission in the performance of services rendered by any employee while acting in his capacity as * * * an escrow agent * * * and while acting in the course of his duties as an employee of the insured."

The Industrial policy, as originally issued in August 1983, contained the following provision on an endorsement entitled "Financial Institutions Endorsement":

"Further, *except insofar as coverage is available to the Insured in the underlying policies* listed in Schedule A, [*e.g.*, the Farmers primary policy,] this Policy does not apply to liability for damages arising out of any negligent act, error, mistake, or omission in performing or failing to perform services as a fiduciary." (Emphasis added.)

That endorsement, which was standard in Industrial's policies for excess insurance for banks, is referred to as "Endorsement 5." Several months later, in December 1983, "Endorsement 17" replaced Endorsement 5. Endorsement 17 provides, in pertinent part:

"A.   In consideration of the reduced [*sic*] premium charged, it is agreed that the following exclusions are added to the policy:

"* * * * *

"3.   To claims arising out of error or omission or a mistake committed or alleged to have been committed by or on behalf of the insured in the conduct of any of the insured's business activities or the rendering of any professional service.

"* * * * *

"Endt. #17 This endorsement supersedes & replaces endorsement #5 and #6."

The crucial issue in this case is whether Endorsement 5 is effective, thus providing insurance for escrow errors and omissions in the same manner as the primary Farmers policy, or whether Endorsement 17 instead applies, excluding

coverage for escrow errors and omissions. The facts surrounding the substitution of Endorsement 17 for Endorsement 5 are discussed in more detail below.

The underlying claims concerning the escrow problems were brought in 1992. First Interstate exhausted the limits of the primary Farmers policy and the second Mid Century policy in settling numerous claims that arose out of these escrow problems, then turned to Industrial for its excess insurance coverage. Industrial ultimately denied First Interstate's claim, basing its denial on Endorsement 17, and First Interstate initiated the present action.

First Interstate alleged in its third amended complaint that Industrial had breached the insurance agreement by denying First Interstate's claim because Endorsement 17 had never become a part of the policy, as it was not supported by consideration. First Interstate also asserted that, if Endorsement 17 did become part of the policy, the policy should be reformed due to mutual or unilateral mistake. First Interstate further alleged that Industrial had breached an implied covenant of good faith and fair dealing, both in contract and in tort, by adding Endorsement 17 to the policy. Finally, First Interstate alleged that, by indicating in a letter in 1993 that Endorsement 5 would be relevant to a claim, Industrial waived any right it had to deny coverage under Endorsement 17.

In its answer, Industrial raised numerous affirmative defenses. It asserted that Endorsement 17, which excluded coverage for the claim, had been substituted for Endorsement 5. It asserted that, because First Interstate had received Endorsement 17 soon after it was issued and had not objected to it, any argument that Endorsement 17 was not a part of the policy was barred by waiver, estoppel or laches. It also asserted that the claims for reformation and breach of covenant of good faith and fair dealing were barred by the relevant statutes of limitations.[2]

First Interstate moved for partial summary judgment on the issue of liability only, asserting that it was entitled to judgment as a matter of law. Industrial also moved for

---

[2] Industrial also raised various other defenses that are not at issue on appeal.

summary judgment on the ground that Endorsement 17 was made part of the policy at the request of First Interstate's agent and that its claims for reformation of the contract and for tortious and contractual breach of the duty of good faith and fair dealing were barred by the applicable statutes of limitations. On the waiver claim, Industrial asserted that First Interstate could not support that claim with legally sufficient evidence and that it was therefore entitled to judgment as a matter of law.

In its letter opinion granting Industrial's motion for summary judgment, the trial court held that Endorsement 17, which was added to the policy at the request of insurance brokers who were acting as agents of First Interstate, was part of the policy. It further held that First Interstate's claims for reformation of the contract accrued, at the latest, in February 1984 when its executive vice president in charge of insurance saw the endorsement. The court further held as a matter of law that Industrial did not have a duty to inform First Interstate of the effect of Endorsement 17, thus defeating First Interstate's claims for breach of the duty of good faith and fair dealing. Finally, the court held that the evidence supporting First Interstate's claim of waiver was insufficient as a matter of law to establish a waiver.

On appeal, First Interstate takes issue with all of the trial court's rulings on summary judgment. The parties agree that California law applies to the claims.[3] First Interstate initially argues that the trial court erred in determining that Endorsement 17 was a part of the insurance contract because: (a) Endorsement 17 was a modification of the contract that was not supported by consideration; and (b) there was evidence from which a jury could have concluded that First Interstate did not assent to the modification of the contract because the jury could have found that the broker who requested Endorsement 17 was not acting within its capacity as an agent for First Interstate. Industrial responds that all of the evidence in the record establishes that the broker represented First Interstate in the transaction and that either no consideration was required when Industrial substituted

---

[3] Where Oregon and California law differ, we have relied on California law in this opinion.

Endorsement 17 for Endorsement 5 at the request of the broker or that adequate consideration was given. The primary thrust of all of Industrial's arguments is that the parties never bargained for escrow errors and omissions coverage and that Endorsement 17 merely reflected the parties' original intentions on the subject.

In order to address these arguments, we must set forth more detail about how Endorsement 17 came to be substituted for Endorsement 5. In April 1983, Albert Howard, First Interstate's vice president in charge of risk management and insurance, retained insurance brokers Marsh & McLennan to procure umbrella and excess comprehensive general liability coverage for First Interstate. First Interstate had had a Farmers primary policy for a number of years and an excess insurance policy from a different insurer in the previous year. Howard, however, was not happy with the excess insurance and instructed Marsh & McLennan to try to find a better deal, preferably full following form insurance, *i.e.*, insurance that provides coverage as broad as that provided by the primary policy. Ralph Baggs of Marsh & McLennan worked with William Cody of NBA Excess and Surplus Lines, a company owned by Marsh & McLennan. NBA Excess worked with insurance underwriters to provide the insurance requested by Marsh & McLennan clients.

Cody solicited a quotation from Industrial for a $4 million excess insurance policy for First Interstate. First Interstate paid a premium of $42,000, and NBA Excess issued a binder on April 4, 1983, setting the policy period from May 19, 1983, to May 19, 1984. In August 1983, Donald Bennett, an underwriter for Industrial, issued the policy as best he could from available data, but Industrial had not, at that point, been provided a copy of the Farmers primary policy. Industrial indicated that it was not willing to issue a policy that provided coverage as broad as the Farmers primary policy without first seeing the Farmers policy.

In September 1983, one of the support staff at NBA Excess wrote to Industrial that "Marsh & McLennan has requested that Endorsement #5 * * * be revised to read per the attached wording," and the attached wording was what

eventually became Endorsement 17. That wording was identical to the wording from a restrictive endorsement that had been part of First Interstate's previous excess liability insurance policy. Other changes in endorsements were requested at the same time. Bennett from Industrial contacted Baggs' assistant at Marsh & McLennan, indicating that he thought that Endorsement 5, which Industrial used in all bank policies, was clearer than Endorsement 17, and suggesting some alterations. In November 1983, Cody wrote to Industrial, asking that it replace Endorsements 5 and 6 with what eventually became Endorsement 17. Later in November, Howard, Baggs, Bennett, and Bennett's supervisor, Law, all met to discuss the policy and, in particular, to discuss adding coverage that would be as broad as that provided in the primary policy. At this meeting, changes to the financial institutions restrictive endorsement were discussed. Shortly thereafter, Law wrote to Baggs, enclosing Endorsement 17 as well as several other endorsements that the parties had discussed. Endorsement 17 and the other endorsements were forwarded to Howard in February 1984 by a Marsh & McLennan employee, who wrote that "Endorsement 17 [is] replacing endorsements No. 5 & 6 to include the correct Financial Institutions Restrictive verbiage." Howard wrote a letter to Baggs, complaining about one of the other endorsements sent at the same time but making no mention of Endorsement 17. Howard indicated in his deposition that he had expressed displeasure about Endorsement 17 to Baggs but was told to "take it or leave it," and he chose to accept it because he felt it was too late in the policy period to try to obtain other insurance.

At the time of the depositions in the present case, none of the Marsh & McLennan or NBA Excess employees involved in the addition of Endorsement 17 had any memory of the events, but all indicated that they were working on behalf of First Interstate and would not have sought to replace Endorsement 5 with Endorsement 17 on behalf of Industrial. The Industrial employees involved in the addition of Endorsement 17 indicated in their depositions that First Interstate had asked that Endorsement 17 replace Endorsement 5.

On appeal, First Interstate asserts that the trial court erred in granting Industrial summary judgment on the question of whether Endorsement 17 was a part of the contract. First Interstate asserts that a jury could have found that Marsh & McLennan and NBA Excess were, in fact, acting as agents for Industrial rather than for First Interstate when they requested that Endorsement 17 replace Endorsement 5 and that a jury could have found that Endorsement 17 did not become part of the contract because it was a contract modification that was not supported by consideration.

██ As to First Interstate's argument that a jury could have found that Marsh & McLennan and NBA Excess were acting as agents for Industrial, we do not agree that there is a genuine issue of material fact on that matter. All of the deposition testimony on this subject, including that of First Interstate's vice president, Howard, indicate that Marsh & McLennan and NBA Excess were agents of the bank, not of the insurer. First Interstate points to an agreement between Industrial and Marsh & McLennan, dated 1979, that authorized Marsh & McLennan to execute certain types of insurance contracts on behalf of Industrial. However, that agreement specified that Marsh & McLennan was *not* authorized to bind Industrial on "Professional or Commercial Umbrella Liability" policies. It is not disputed that the present case involves a commercial umbrella liability policy. The existence of an agency agreement between Marsh & McLennan and Industrial concerning other types of insurance does not create a genuine issue of material fact as to who Marsh & McLennan represented in the transaction at issue here, where all of the evidence concerning *this* transaction indicates that Marsh & McLennan represented First Interstate. In any event, this entire argument rests on the notion that it was Marsh & McLennan that "accepted" Endorsement 17 and that, if Marsh & McLennan were not acting for First Interstate, then First Interstate never "accepted" Endorsement 17. However, uncontradicted evidence in the record shows that First Interstate's vice president Howard accepted Endorsement 17 in February 1984, when it was forwarded to him along with other endorsements. In his deposition, he indicated that, although he was not happy with Endorsement 17, he nonetheless agreed to it at that point.

First Interstate next argues that the trial court erred because, as a matter of law, Endorsement 17 was a modification for which no consideration was given and, thus, did not become part of the contract. As noted above, the endorsement states that it was made "[i]n consideration of the reduced premium charged[.]" It is not disputed that, at the time Endorsement 17 was substituted for Endorsement 5, First Interstate had paid its premium and that none of the premium was refunded when the endorsements were changed. First Interstate argues that, because the premium was not reduced, no consideration supports the modification of the contract that occurred when Endorsement 17 was substituted.

· Industrial responds that Endorsement 17 was not a modification of the contract but was part of the ongoing negotiation of the contract's terms. Industrial argues that First Interstate never accepted Endorsement 5 in the first place, as shown by its agent's instructions that Endorsement 5 be replaced by Endorsement 17. Alternatively, Industrial argues that its agreement to numerous other endorsements requested by First Interstate at the same time as Endorsement 17 was requested constitutes consideration for Endorsement 17, as at least one of those other requested endorsements expanded coverage under the policy.

■ We do not reach Industrial's second argument on this point, because we agree with its first argument. The policy was issued in August 1983 and, in the following month, First Interstate's agents requested that Endorsement 5 be replaced with Endorsement 17, which Industrial ultimately agreed to do. Industrial provided unrebutted testimony that the parties had not negotiated for errors and omissions insurance to be included in the policy and that it had not known that the Farmers primary policy contained such coverage. We conclude that, under circumstances such as these, an ongoing effort to reduce the parties' original agreement to writing is not a modification of a contract for which consideration must be shown. It is clear from the documentation regarding the substitution of Endorsement 5 with Endorsement 17, and implicit from the deposition testimony described above, that, during this period, the parties were attempting to clarify the terms of their agreement. Under

those circumstances, the ongoing negotiation and ultimate alteration of the wording of an endorsement to an insurance policy is not a contract modification for which additional consideration must be shown. *Cf. Linnastruth v. Mutual Ben. H. & Accident Assn.*, 22 Cal 2d 216, 219, 137 P2d 833 (1943) (if insured's acceptance of insurance contract modifies or alters any of the terms, insurer must, in turn, accept alteration before it becomes effective). The trial court correctly concluded that Endorsement 17 was a part of the contract between First Interstate and Industrial.

First Interstate also argues that, if Endorsement 17 was a part of the contract, then the trial court erred in denying its claim for reformation of the contract based on mutual mistake or unilateral mistake. The trial court denied those claims on the ground that they were time barred, stating that the claims for reformation accrued at the latest in February 1984, when Howard received Endorsement 17, and that the relevant statute of limitations under California law was three years.

■ Under California law, an action for relief on the ground of mistake accrues on "the discovery, by the aggrieved party, of the facts constituting the fraud or mistake," and must be brought within three years of that discovery. Cal Code of Civ Pro § 338. On appeal, First Interstate argues for the first time that the relevant statute of limitations is the four-year limitation period for an action in contract. Cal Code of Civ Pro § 337. First Interstate further asserts that, under the contract statute of limitations, its cause of action did not accrue until Industrial denied its claim in 1995. First Interstate also contends that its argument is sufficiently preserved under *State v. Hitz*, 307 Or 183, 766 P2d 373 (1988), because it preserved the broader "issue" of when the statute of limitations began to run by arguing that it began to run in 1995. However, a review of the record shows that the case that First Interstate's counsel was addressing when he made that argument in the trial court was a California case decided under section 338, pertaining to mistake, and not under section 337, pertaining to the contract statute of limitations. The rationale for appellate courts' preservation of error rules includes ensuring that the trial court had an opportunity "to

understand and correct any error." *State v. Brown*, 310 Or 347, 356, 800 P2d 259 (1990). We do not believe that counsel's argument about when a cause of action might accrue under section 338 was sufficient to put the trial court on notice that an entirely different statute of limitations might be applicable to the question. We conclude that First Interstate's argument on this point is unpreserved, and we decline to consider it. ORAP 5.45(2).

First Interstate contends that the trial court also erred in granting Industrial's motion for summary judgment on its claims for contractual and tortious breach of the covenant of good faith and fair dealing. Those claims alleged in pertinent part that Industrial had misled First Interstate, narrowing the coverage by substituting Endorsement 17 for Endorsement 5. The court based its ruling on the conclusion that, as a matter of law, Industrial "had no legal duty to inform plaintiff of the effect of Endorsement 17." On appeal, First Interstate argues that the trial court erred, relying primarily on *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal 3d 809, 169 Cal Rptr 691, 620 P2d 141 (1979), *cert den* 445 US 912 (1980). Although *Egan* does provide a good synopsis of California law on the subject of the covenant of good faith and fair dealing in the insurance context, we do not find it particularly helpful in this case. In *Egan*, the claim for breach of the covenant of good faith and fair dealing was based on the insurer's inadequate investigation of a disability claim. 24 Cal 3d at 817-18. The present claim, on the other hand, concerns the substitution of one endorsement for another, at the request of an agent of the insured.

The basic premises of contractual and tortious breach of a covenant of good faith and fair dealing under California law are not in dispute here. Parties to a contract are obliged to "refrain from doing anything to injure the right of the other to receive the benefits of the agreement." 24 Cal 3d at 818, *citing Murphy v. Allstate Ins. Co.*, 17 Cal 3d 937, 132 Cal Rptr 424, 553 P2d 1584 (1976). In the insurance context, an insurer has a duty to take into consideration the welfare of its insureds in deciding whether to settle a claim, and to investigate claims thoroughly before denying them. *Egan*, 24 Cal 3d at 818-19 (citing cases).

First Interstate argues that the substitution of Endorsement 17 for Endorsement 5 injured its rights to receive benefits under the agreement and that the trial court therefore erred in granting Industrial's motion for summary judgment. Industrial responds that the covenant of good faith and fair dealing under California law concerns investigation and settlement of insurance claims but generally does not extend to the negotiation of insurance contracts.[4] In particular, Industrial argues that, under California law, insurers generally do not have a duty to advise insureds about the effects of policy exclusions or to recommend different coverage from that sought by the insured. *See generally Malcolm v. Farmers New World Life Ins. Co.*, 4 Cal App 4th 296, 303-04, 5 Cal Rptr 2d 584 (1992) (no duty to advise insured specifically about exclusion and its effect on coverage); *Ahern v. Dillenback,* 1 Cal App 4th 36, 42-43, 1 Cal Rptr 2d 339 (1991) (no duty to procure more insurance than the insured requested); *Gibson v. Government Employees Ins. Co.,* 162 Cal App 3d 441, 452, 208 Cal Rptr 511 (1984) (no duty to provide advice on amount of coverage).

First Interstate's arguments that Industrial breached a covenant of good faith and fair dealing rest on its assertion that there was a genuine issue of material fact about whether Marsh & McLennan requested the substitution of Endorsement 17 for Endorsement 5 on behalf of First Interstate or on behalf of Industrial. As discussed above, there is no genuine issue of material fact on that point. Marsh & McLennan acted as First Interstate's agent, and Marsh & McLennan requested the substitution of endorsements. First Interstate also seems to be contending that, regardless of how the endorsements got substituted, Industrial was secretly thrilled to have the opportunity to substitute endorsements and that it therefore was not acting in good faith when it did so.[5]

---

[4] Industrial acknowledges that California Insurance Code section 785 requires that insurers exercise good faith in negotiating insurance contracts when the prospective insured "is age 65 or older." Clearly, that provision does not apply here.

[5] We note that the only documentary evidence on this point indicates that Industrial, in fact, did *not* initially want to substitute Endorsement 17 for Endorsement 5.

How Industrial felt about the substitution of endorsements is not relevant to the question before us. The question is whether Industrial breached a duty to its insured by agreeing to a substitution of endorsements that the insured requested without providing an opinion to the insured about how the change might affect overall coverage. It is clear that no such duty exists under California law under circumstances such as these. The trial court correctly concluded that California law does not impose a duty on an insurer to advise an insured about the scope of a restrictive endorsement that the insured itself has requested. *See Gibson*, 162 Cal App 3d at 452; *cf. Fireman's Fund Ins. Co. v. Fibreboard Corp.*, 182 Cal App 3d 462, 227 Cal Rptr 203 (1986) (where large corporate entities represented by insurance brokers negotiated policy, and insured itself proposed the disputed exclusion language, court would not construe exclusion strictly against insurer). The trial court properly granted Industrial summary judgment on First Interstate's claim for breach of the covenant of good faith and fair dealing.

Finally, First Interstate argues that the trial court erred in granting Industrial summary judgment on First Interstate's claim that Industrial waived its right to rely on Endorsement 17 because, when Industrial first learned of the underlying claims concerning the escrow errors and omissions, it identified Endorsement 5, rather than Endorsement 17, as applicable. In 1993, after Industrial became aware of the underlying claims against the bank, but before the primary and first layer excess insurance coverage had been exhausted, one of its agents, Zerkle, wrote to Howard at First Interstate. That letter stated in part that Industrial was not able to "give a definitive coverage statement," as the other insurance had not been exhausted. The letter further stated:

> "My review would indicate that [the] only endorsements which have possible applicability to this situation would be endorsements number 5 and 6. * * * [W]e are unable to advise you at this point as to whether or not these endorsements might give rise to coverage under our policy since coverage under the Farmers Group policies has not been clearly defined."

It was not until 1995 that Industrial took the position that Endorsement 17 excluded coverage for the escrow errors and omissions at issue in the underlying claims.

■ First Interstate argues that there is a genuine issue of material fact as to whether the 1993 letter waived Industrial's right to rely on Endorsement 17 to deny coverage. We do not agree. Although questions of waiver do often present factual issues, we find no genuine issue of material fact in the present case. Industrial clearly was aware of the underlying dispute when its agent drafted the above-quoted letter in 1993, but it was not until mid-1994 that First Interstate actually made any claims under the Industrial policy, because it was not until that point that the damages claimed by the plaintiffs in the underlying disputes exceeded the amounts of the primary and first excess liability insurance policies.

■ Under California law, a letter sent by an insurer indicating that it could not advise its insured about whether there would be coverage cannot provide the basis for a waiver of the insurer's right to rely, at a later point, on a restrictive endorsement not mentioned in the letter. In California, as in Oregon, waiver involves an "intentional relinquishment of a known right." *Waller v. Truck Ins. Exchange*, 11 Cal 4th 1, 31, 44 Cal Rptr 370, 900 P2d 619 (1995). In the insurance context, California courts have held on several occasions that failure to mention a ground for denial of a claim in a letter does not waive an insurer's right to rely on that ground for denial of a claim.[6] *See, e.g., State Farm Fire & Cas. Co. v. Jioras*, 24 Cal App 4th 1619, 1628 n 7, 29 Cal Rptr 2d 840 (1994) (waiver cannot be established merely by evidence that an insurer failed to specify an exclusion in a reservation of rights letter); *Velasquez v. Truck Ins. Exchange*, 1 Cal App 4th 712, 722, 5 Cal Rptr 2d 1 (1994) (intention to waive a limitations provision was not shown by failure to raise issue in a letter denying the claim); *Waller*, 11 Cal 4th at 30-31 (same). Here, the letter that First Interstate claims supports its position that there was a waiver identified potentially relevant

---

[6] We note that, under Oregon law, it is unlikely that a claim for waiver could be made under these circumstances. *See ABCD...Vision v. Fireman's Fund Ins. Companies*, 304 Or 301, 307, 744 P2d 998 (1978) (estoppel cannot be invoked to expand insurance coverage).

endorsements other than the one ultimately relied on, but it also clearly communicated that Industrial was not, at that point, able to take a firm position as to coverage. Under California law, that letter cannot, as a matter of law, provide the basis for a claim of waiver. The trial court correctly granted Industrial's motion for summary judgment on this claim.

Affirmed.