132 P.3d 1061 (2006)
205 Or. App. 64
STATE of Oregon, by and through the PUBLIC EMPLOYEES' BENEFIT BOARD, Plaintiff,
v.
OREGON HEALTH AND SCIENCES UNIVERSITY, an Oregon public corporation, fka Oregon Health Sciences University, an Oregon public corporation, and Paul J. Sundermier, individually and as a representative of the Defendant Class, Defendants.
Oregon Health and Sciences University, an Oregon public corporation, fka Oregon Health Sciences University, an Oregon public corporation, and Paul J. Sundermier, individually and as a representative of the Defendant Class, Appellants,
v.
State of Oregon, by and through the Public Employees' Benefit Board, Respondent.
00C-12945; A122631.
Court of Appeals of Oregon.
Argued and Submitted April 28, 2005.
Decided April 5, 2006.
*1062 Steven M. Wilker, Portland, argued the cause for appellant Oregon Health and Sciences University. With him on the briefs was Tonkon Torp LLP.
Maureen Leonard argued the cause for appellant Paul J. Sundermier. With her on the briefs was Steven V. Rizzo.
Richard D. Wasserman, Attorney-in-Charge, Civil/Administrative Appeals Unit, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Jas. Jeffrey Adams, Assistant Attorney General.
Before EDMONDS, Presiding Judge, and BREWER,[*] Chief Judge, and WOLLHEIM, Judge.
WOLLHEIM, J.
Respondent State of Oregon, by and through the Public Employee Benefits Board (PEBB), received approximately $19.5 million as a result of the demutualization[1] of Standard Insurance Company (Standard) and the policies of group life and disability insurance that PEBB had maintained with Standard for the benefit of state employees and employees of appellant Oregon Health and Science University (OHSU). OHSU made a claim to a share of the demutualization proceeds based on the proportion of PEBB's members who were OHSU employees on the record date of demutualization. Two employees of the State of Oregon also claimed an interest in the fund. Appellant Paul J. Sundermier, an employee of the Department *1063 of Justice, sought a pro rata distribution of proceeds to each employee who contributed to payment of insurance premiums. Stephen Barrett, an employee of the Department of Human Services, also sought an interest in the proceeds on his own behalf and on behalf of other employees similarly situated.[2]
PEBB responded to the claims of OHSU, Sundermier, and Barrett by filing a complaint in interpleader under ORCP 31,[3] naming them as defendants and seeking a declaration that PEBB is the owner of the funds. Each defendant filed counterclaims, seeking declaratory and monetary relief. The trial court dismissed PEBB's second amended interpleader complaint with prejudice, reasoning that, because PEBB also asserted an interest in the funds, interpleader was not the appropriate pleading, and requiring PEBB to plead affirmatively the legal and factual bases for its interest in the funds. PEBB chose not to replead. The court entered judgment for defendants on PEBB's complaint under ORCP 67 B, and the case proceeded on defendants' counterclaims.
The trial court certified a defendant class, consisting of all former and current employees of the State of Oregon (including employees of OHSU) who were insured by Standard pursuant to employee benefit plans on or before December 17, 1997, the record date of Standard's demutualization. Sundermier was designated as the representative for the class and brought counterclaims based on contract and tort theories of recovery. Barrett subsequently withdrew, considering himself to be a member of the class represented by Sundermier.[4]
In his amended answer, Sundermier asserted counterclaims against PEBB arising out of its failure to distribute the demutualization proceeds to individual employees. Sundermier also alleged counterclaims against PEBB and cross-claims against OHSU arising out of PEBB's June 1998 transfer of funds to OHSU from the PEBB rate stabilization fund. On PEBB's motion, the trial court dismissed the class action counterclaims for lack of subject matter jurisdiction, ruling that they could be maintained only under the Administrative Procedures Act, ORS 183.490. The court also dismissed Sundermier's cross-claims against OHSU.
The class then filed a petition for judicial review under ORS 183.490 to compel PEBB to distribute the proceeds, and a petition for peremptory writ of mandamus under ORS 34.150, seeking a judgment directing PEBB to distribute the demutualization proceeds pro rata to all members of the class as the contractual and equitable owners of the funds. PEBB also sought to dismiss the claims of OHSU, and OHSU repleaded its claims in a petition for judicial review. The case proceeded on the claims as repleaded in the petitions. On cross-motions for summary judgment, the trial court granted PEBB's motion and denied the motions by OHSU and Sundermier, dismissing all of their claims.[5] OHSU and Sundermier appeal.
As far as our standard of review is concerned, this case presents an interesting hybrid of rulings on cross-motions for summary judgment in the context of a proceeding under ORS 183.490. The circuit court's decision is subject to review under ORS 183.500, *1064 which provides that the appeal "shall be taken in the manner provided by law for appeals from the circuit court in suits in equity." Although, as we said in Powell v. Bunn, 185 Or.App. 334, 339 n. 3, 59 P.3d 559 (2002), rev. den., 336 Or. 60, 77 P.3d 635 (2003), the practical import of that standard is not altogether clear, here the resolution of the appeal depends on legal issues only. Accordingly, we review the circuit court's rulings for errors of law, and reverse and remand on OHSU's appeal and affirm on Sundermier's appeal.

I. BACKGROUND
PEBB,[6] a part of the Oregon Department of Administrative Services, administers state employee benefit plans. PEBB has the duty to
"(1) * * * study all matters connected with the providing of adequate benefit plan coverage for eligible state employees on the best basis possible with relation both to the welfare of the employees and to the state. * * *
"(2) In carrying out its duties * * * the goal of the board shall be to provide a high quality plan of health and other benefits for state employees at a cost affordable to both the employer and the employees."
ORS 243.125. PEBB has exclusive control of state employee benefit plans and the selection of and negotiation with insurance carriers. PEBB also administers the Public Employees' Benefit Account (PEBA), a statutory account funded by a two percent surcharge on premiums to meet PEBB's administrative expenses. ORS 243.165 (1999), amended by Or. Laws 2001, ch. 655, § 3; ORS 243.185 (1999), amended by Or. Laws 2001, ch. 655, § 4.[7] In addition to PEBA, PEBB maintained a rate stabilization fund in a separate account with the State Treasurer, which it used to offset health insurance premium increases during the course of a plan year.
For many years, PEBB obtained group life, accidental death and dismemberment, and disability coverage for state employees through Standard, a domestic mutual insurer. PEBB was the named policyholder on those policies. However, PEBB did not pay the premiums. The parties agree that state employee insureds "paid" the premiums through monthly employer contributions to their benefit plans and deductions from their paychecks. See ORS 243.285.
As noted, Standard was a mutual insurer. In 1998, Standard's board of directors decided to demutualize, i.e., to convert to a stock insurer and a wholly owned subsidiary of a *1065 corporation publicly traded on the New York Stock Exchange.[8] We take a detour from our chronology for a brief description of mutual insurance and the process of demutualization. As a stock insurer is owned by its stockholders, a mutual insurer is owned by its policyholders. The premiums that policyholders pay constitute a common fund for payment of losses. In UNUM Corporation v. United States, 130 F.3d 501, 503 n. 1 (1st Cir.1997), cert. den., 525 U.S. 810, 119 S.Ct. 42, 142 L.Ed.2d 32 (1998), the court explained:
"Mutual life insurance companies do not raise money by issuing capital stock, but rather by charging policyholders a `redundant premium' that exceeds the amount actuarially anticipated to pay the policy's benefits and expenses. The excess portions of these premiums are accumulated, retained and invested as `surplus.'
"A mutual insurer's accumulated surplus is the excess of assets over liabilities. Such an excess results from the accumulation of redundant premiums and investment earnings over the life of the company. Surplus generally belongs to the mutual insurer's members in proportion to their contributions, and is generally returned to policyholders through policyholder dividends.
"Mutual insurers are thus owned by their policyholders. Policyholders in mutual companies are denominated `members' of the company; their ownership rights in the company are their `membership interests.' Members of mutual insurance companies have many of the same rights as stockholders in corporations, including the right to vote and the right to residual surplus upon liquidation."
The Oregon Revised Statutes contain provisions governing mutual insurers and the process of demutualization. See ORS 732.465-732.480; ORS 732.600-732.630. ORS 732.465(1) provides that a domestic mutual insurer is "owned by and operated in the interest of its members." ORS 732.600(7)(a) defines a "member" of a mutual insurer as any
"owner of one or more policies of insurance * * * issued by the mutual insurer. For purposes of this definition, `owner' has the meaning given that term in ORS 732.465(3)."
ORS 732.465(3), in turn, defines "owner" as:
"the person given the rights of ownership or the power to make transactions with the insurer under terms of the policy * * *. In a policy of group life or health insurance [[9]] the person contracting with the insurer and to whom the master contract is issued is the member; the lives insured and the individuals holding certificates thereunder are not policyholders or members."
(Emphasis added.) Thus, under Oregon law, the group policyholder, as the person holding the master contract, is the "member" and owner of the mutual insurer.
Upon conversion of a mutual insurer to a stock insurer,
"the membership interest of all members of the converting mutual insurer, whether or not eligible members, shall be extinguished, and the eligible members of the converting mutual insurer shall be entitled to receive the consideration described in ORS 732.612 in accordance with the plan."
ORS 732.616(1). Only "eligible members" are entitled to receive consideration upon demutualization of a mutual insurer. Under ORS 732.600(7)(a), an "eligible member" is a member whose policy was in force as of the record date for the plan of conversion. Because, under ORS 732.465(3), the group policyholder is the member of the mutual insurer, demutualization consideration is paid to the group policyholder. There is no provision in ORS 732.600 to 732.630 for payment of demutualization consideration to the individual insureds in the group.
*1066 We return to our chronology. In accordance with Oregon law governing the conversion and reorganization of domestic mutual insurers, Standard developed a plan of reorganization, ORS 732.606(1); ORS 732.610, and obtained approval of its plan from the Director of the Department of Consumer and Business Services (DCBS). ORS 732.606(2), (3); ORS 732.626.[10] Standard's reorganization plan described "eligible members" as policyholders with policies in effect as of December 17, 1997. All of the group policies involved in this case provided that PEBB was the "policyholder."[11] It is undisputed that PEBB was an "eligible member" of Standard entitled to receive consideration upon demutualization, and that the state employee insureds were not eligible members.
Standard's plan required Standard to provide "consideration for the membership interests of the eligible members of a converting mutual insurer," in the form of stock options, shares, cash, premium credits, or in any other form approved by DCBS.[12] Pursuant to ORS 732.612(1) and (6), Standard developed a formula for determining and allocating consideration to eligible members for their membership interests that consisted of two components: a fixed component consisting of 52 shares of Holding Company Stock to each eligible member as compensation for loss of membership rights, and a variable component based on an actuarial calculation designed to determine the policyholder's contribution to Standard's accumulated surplus plus the present value of the policyholder's expected future surplus contributions.
Pursuant to ORS 732.606(5), PEBB voted to approve the reorganization plan. PEBB did not notify individual insureds of the plan or give them an opportunity to participate in PEBB's decision to approve the plan. Standard's demutualization became final on April 16, 1999. Standard determined that PEBB was entitled to consideration of $19,499,676.25 with respect to the group policies PEBB administered for state employees, and on April 21, 1999, Standard sent PEBB a check for that amount.[13]
PEBB initially deposited Standard's check into the PEBB rate stabilization fund. The next day, PEBB transferred the money into a newly created account in the State Treasury entitled "PEBB Trust Account: Standard Insurance Demutualization Proceeds." The claims of Sundermier and OHSU focus on whether and to whom PEBB is required to distribute the funds in that account.

II. THE SUNDERMIER CLASS ACTION
We first address Sundermier's appeal, because it is potentially dispositive of OHSU's appeal. Sundermier's amended answer alleged counterclaims of breach of fiduciary duty, negligent misrepresentation, breach of contract, implied contract/unjust enrichment, unlawful takings, declaratory judgment, waiver/estoppel, breach of fiduciary duty, and injunctive relief. The circuit court dismissed all of the counterclaims, concluding that the Administrative Procedures Act (APA) was Sundermier's exclusive remedy. In his first assignment of error, Sundermier contends that the trial court erred in *1067 requiring the class to proceed under the APA, ORS 183.490. On appeal, PEBB takes no position on whether or not the case falls within the APA but acknowledges, simply, that whatever its source, the circuit court "unquestionably had subject-matter jurisdiction to adjudicate the issues before it, which are questions of law," and "there is no barrier to this court's ability to rule on the substantive issues presented on appeal."
We readily agree with the circuit court that those of Sundermier's claims seeking a distribution from the PEBB trust account are subject to the APA. Under ORS 293.265, all funds "collected or received by" any state agency are deposited with the State Treasurer. A person aggrieved by the disallowance of a claim for payment of "any moneys in the State Treasury" may seek judicial review of the disallowance under ORS 183.482. ORS 293.316. As noted, the demutualization proceeds are held in a special trust account of the State Treasury. Any claim against those funds is subject to the provisions of ORS chapter 293. PEBB's disallowance of Sundermier's claims against the funds would therefore have been subject to judicial review under ORS 183.482. But PEBB did not expressly allow or disallow Sundermier's claims; instead, it filed the interpleader complaint in this proceeding, seeking a judicial determination of its rights and obligations respecting the funds. There is no final administrative order disposing of the claims.
ORS 183.490 provides:
"The court may, upon petition as described in ORS 183.484, compel an agency to act where it has unlawfully refused to act or make a decision or unreasonably delayed taking action or making a decision."
Several of the counterclaims, including implied contract, takings, declaratory judgment, and waiver/estoppel, seek a distribution to individual employees of funds from the PEBB trust account. Those counterclaims in effect seek to compel PEBB to act on Sundermier's claim to the funds. We conclude, therefore, that they are properly cognizable under ORS 183.490. See Mendieta v. Division of State Lands, 148 Or.App. 586, 598, 941 P.2d 582 (1997), rev. dismissed, 328 Or. 331, 987 P.2d 510 (1999) (ORS 183.490 is the appropriate mechanism when an agency refuses to act). The trial court did not err in concluding that ORS 183.490 is the exclusive remedy for those counterclaims seeking a distribution of funds from the PEBB trust account.
We reach a different conclusion, however, with respect to Sundermier's tort and breach of contract counterclaims. As we said in Ashland Drilling, Inc. v. Jackson County, 168 Or.App. 624, 630, 4 P.3d 748, rev. den., 331 Or. 429, 26 P.3d 148 (2000), citing Bay River v. Envir. Quality Comm., 26 Or.App. 717, 723, 554 P.2d 620, rev. den., 276 Or. 555 (1976), ORS 183.490 pertains to an agency's nonfeasance in refusing to act or delaying an act, or in refusing to make or delaying a decision. ORS 183.490 does not, however, provide a remedy for tortious or unlawful agency action. See Mendieta, 148 Or.App. at 598, 941 P.2d 582 (stating scope of statute); Premier Technology v. Oregon State Lottery, 136 Or.App. 124, 132, 901 P.2d 883 (1995) (breach of contract claim does not fall under APA). Here, Sundermier's counterclaims of breach of contract, breach of fiduciary duty, and negligent misrepresentation seek relief for affirmative misconductnot for inaction or a refusal to act. Accordingly, we conclude that the circuit court erred in determining that those counterclaims must proceed under ORS 183.490 and also erred in dismissing them on that ground.
With the exception of the counterclaim for breach of fiduciary duty, the parties urge that we nonetheless consider the merits of the dismissed counterclaims rather than remand them, as the record has been fully developed, there are no factual issues in dispute, and the legal issues were fully briefed below and considered by the circuit court when it ruled on summary judgment.
We conclude that all of the Sundermier counterclaims, including the counterclaim for breach of fiduciary duty, were fully pleaded and that the issues on appeal are exclusively legal. We see no jurisdictional impediment to our consideration on appeal of the legal arguments relating to the merits of those counterclaims. On appeal, however, with the exception of the takings claim, the parties do *1068 not separately address the individual dismissed counterclaims. Rather, Sundermier makes only general arguments on various theories regarding the class's ownership of or entitlement to the funds and the authority of the state to retain and distribute them. We accordingly conclude that those are the only issues before us. We therefore proceed to Sundermier's assignments of error pertaining to those issues.
In his second assignment, Sundermier asserts that the circuit court erred in granting PEBB's motion for summary judgment. The arguments under that assignment address PEBB's authority to retain and distribute the funds. In his third assignment, Sundermier asserts that the circuit court erred in denying his motion for summary judgment. The arguments under the third assignment address generally the individual insureds' interests in the demutualizations proceeds. The fourth assignment asserts that the circuit court erred in dismissing Sundermier's takings claim. He argues that the statutory provisions depriving the class of their entitlement to the funds violate both the state and federal constitutions. We address each of the arguments, in a slightly different order than was presented in the briefs.
Sundermier contends that the demutualization consideration belongs to the individual state employee insureds because, as the persons who paid the premiums, the individual insureds owned Standard's surplus, on which the consideration was based.[14] Sundermier's theory finds no support in the statutes. There is no dispute that money for payment of Standard group insurance premiums came from state employee insureds' contributions, and that portions of those premiums accumulated and were invested by Standard as "surplus." As our survey of the statutes shows, however, Sundermier is mistaken in his view that the payment of premiums translates into an ownership interest in Standard's surplus or in the demutualization proceeds. Mutual insurers are owned by their members. ORS 732.465(1). A "membership interest" in a mutual insurer is defined as "any right that a member of the mutual insurer may hold by virtue of membership in the mutual insurer." ORS 732.600(8)(a). PEBB, as the group insurance policyholder, was the "member" of Standard, with the attendant membership interest. ORS 732.465(3). The demutualization consideration was paid to PEBB for the extinguishment of its membership interest, ORS 732.616(1), not for the reimbursement of premiums or a share of the surplus. Although premium payments gave rise to Standard's surplus, contrary to Sundermier's view, the individual insureds have no membership or ownership interest in Standard. In a policy of group insurance, there is no direct link between the payment of premiums and a membership interest in the mutual insurer. The insureds' premium payments buy insurance coverage, but not membership in the mutual insurer. In the many provisions of ORS chapter 732 regarding mutual insurers and the conversion of a mutual insurer to a stock insurer, there is no indication that the legislature contemplated that an individual insured has a membership interest in the mutual insurer or that a group policyholder "member" of a mutual insurer must distribute the proceeds of demutualization to the individual insureds.
Sundermier acknowledges that the statutes make no provision for a distribution of demutualization proceeds to the individual insureds. That is so, Sundermier asserts, because the statutes govern only the relationship between the policyholders and the insurer, but do not purport to govern rights to the proceeds as between the policyholder and the individual insureds. Those rights, he asserts, are established in principles of contract, equity, and tort law, which he contends are not altered or affected by the demutualization statutes. In other words, in Sundermier's view, although the provisions of ORS 732.600 to 732.630 require payment of the demutualization consideration to the group policyholder, that does not mean that the group policyholder owns or may retain those *1069 proceeds. In that vein, Sundermier puts forth several additional theories why, as between the parties, the individual insureds are entitled to a pro rata share of the proceeds.
Sundermier asserts that the right of the individual insureds to the demutualization proceeds is derived from their contractual and statutory ownership interests in the insurance policies. For example, the certificates of insurance give the individual insureds the rights to coverage, to change beneficiaries, to make claims, and to the policy proceeds. Oregon statutes provide the individual insureds of a group insurance policy with conversion rights and the right to assign the insured's ownership interest. See, e.g., ORS 743.333; ORS 743.336 (conversion rights in group life insurance policies); ORS 743.345 (right to assign insured's ownership interest in group life insurance policy). We agree with Sundermier that the individual insureds have interests in the policies of insurance; however, we conclude that those are the interests of an insured and do not translate into a membership or ownership interest in the mutual insurer that would entitle them to share in the demutualization consideration.
Sundermier contends that, in its various roles administering benefit programs for state employees, PEBB acts as a fiduciary to the state employee individual insureds, and therefore owes them a duty of loyalty that requires PEBB to safeguard the demutualization proceeds for their benefit. PEBB does not dispute that it acts on behalf of the employees. It points out, however, that it also acts on behalf of the state. See ORS 243.125 ("the goal of the board shall be to provide a high quality plan of health and other benefits for state employees at a cost affordable to both the employer and the employees"). It asserts that, because of its statutory obligation to seek to achieve a balance in serving two interests that are occasionally in competition, it is not a fiduciary to the state employee insureds and cannot be held to the common-law standard of undivided loyalty that applies to a fiduciary.
In In re Kimmell, 332 Or. 480, 31 P.3d 414 (2001), the Supreme Court quoted from Black's Law Dictionary 625 (6th ed 1990), as authority for its explanation that one acts in a "fiduciary capacity"
"when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part."
Id. at 491 n. 9, 31 P.3d 414. In Miller v. C.C. Meisel Co., Inc., 183 Or.App. 148, 166, 51 P.3d 650 (2002), we explained, citing the Restatement (Second) of Agency § 13 comment a (1958), that "a fiduciary [is] a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." We recognize that the business PEBB transacts in administering benefit plans on behalf of state employees, with state employee funds, arguably includes the types of responsibilities carried out by a fiduciary. The statutory provisions lead us to conclude otherwise, however, with respect to PEBB.
As noted, PEBB is within the Department of Administrative Services. ORS 243.061(1). PEBB's board members are not described as fiduciaries.[15] In fact, voting members of PEBB include four members "representing the state as an employer and management employees," ORS 243.061(1)(a), and four members "representing nonmanagement representable employees." ORS 243.061(1)(b). Thus, individual board members are expressly assigned to represent particular interests. That is inconsistent with an undivided duty of loyalty to the employees.
ORS 243.125 (1999), amended by Or. Laws 2001, ch. 655, § 5, describes the powers and duties of PEBB:
"(1) The Public Employees' Benefit Board shall prescribe rules for the conduct of its business. The board shall study all matters connected with the providing of adequate *1070 benefit plan coverage for eligible state employees on the best basis possible with relation both to the welfare of the employees and to the state. The board shall design benefits, devise specifications, analyze carrier responses to advertisements for bids and decide on the award of contracts. Contracts shall be signed by the chairperson on behalf of the board. "(2) In carrying out its duties under subsection (1) of this section, the goal of the board shall be to provide a high quality plan of health and other benefits for state employees at a cost affordable to both the employer and the employees."
(Emphasis added.) Other provisions of ORS chapter 243 further describe PEBB's duties, including its duty to establish rules of eligibility, participation, and coverage, ORS 243.125 (1999); to "contract for a health benefit plan or plans best designed to meet the needs and provide for the welfare of eligible employees and the state," ORS 243.135(1) (emphasis added); and to "employ whatever means are reasonably necessary to carry out the purposes of [its enabling statutes]." ORS 243.145. Nothing in those provisions demonstrates that PEBB functions as a fiduciary.[16]
That is not to say that a fiduciary relationship exists only when it is expressly stated. As we said in Strader v. Grange Mutual Ins. Co., 179 Or.App. 329, 334, 39 P.3d 903, rev den, 334 Or. 190, 47 P.3d 485 (2002), the crucial aspect of a relationship is not its name, but the roles that the parties assume in the particular interaction * * *." See, e.g., Ainslie v. First Interstate Bank, 148 Or.App. 162, 181, 939 P.2d 125 (1997), rev. dismissed, 326 Or. 627, 964 P.2d 1029 (1998) (administrative rule requiring funds escrowed in connection with securities offering to be held in trust for benefit of investors creates fiduciary or trust relationship between investors and escrow agent, as well as between investors and seller). Here, PEBB's statutory role in administering benefit programs on behalf of both the state and employees gives rise to an equal duty to both, but cannot reasonably be understood to give rise to an undivided duty of loyalty to either.
Sundermier acknowledges the dual nature of PEBB's statutory obligation, but contends that, with respect to its function as a group policyholder for the employees, PEBB's duties run exclusively to the individual insureds as a fiduciary. We reject that contention. A group insurance policyholder is variously regarded as an agent of the insured, an agent of the insurer, or both, depending on the function and the nature of the relationship as indicated by governing contractual or statutory provisions. See Lee R. Russ, Couch on Insurance 3d, § 8:8-8:15 (2005) (describing relationships in group insurance). Here, as we have explained, the statutory provisions do not suggest that PEBB functions as a fiduciary to the employees, and there is no contractual provision imposing that duty with respect to the individual insureds.[17]
Sundermier asserts that, apart from its express statutory roles, in the unique situation presented here, PEBB has fiduciary responsibilities with respect to these particular demutualization funds belonging exclusively to the employees who paid the premiums. The first difficulty with that contention is that, as we have concluded, the demutualization *1071 proceeds do not belong to the individual insureds, but to PEBB. The second difficulty with the assertion is that PEBB is a creature of statute; it has no functions or duties apart from those conferred by its enabling legislation. City of Klamath Falls v. Environ. Quality Comm., 318 Or. 532, 545, 870 P.2d 825 (1994) (as creatures of statute, agencies derive their authority from the enabling legislation and general laws affecting administrative bodies). There is no statutory provision that places PEBB in a fiduciary capacity toward the individual insureds with respect to the funds.
In fact, PEBB's statutory role with respect to the management of funds is quite limited. PEBB does not process the money deducted from employee paychecks or contributed by employers for the payment of insurance premiums. The money is transferred directly from state payroll centers to the insurer. ORS 243.285(2). Apart from its authority over PEBA and the rate stabilization fund, both of which function as limited, short-term accounts,[18] PEBB does not administer funds; it administers programs. Its receipt of the demutualization consideration placed PEBB in a unique and not fully anticipated role of fund administrator.
We consider at this point PEBB's acknowledgment that it must use the demutualization proceeds for the benefit of state employee PEBB members, collectively. PEBB's acknowledgment that it holds the demutualization funds for the benefit of state employee PEBB members can only mean that, with respect to those funds, PEBB has assumed the responsibilities of a trustee and, hence, a fiduciary. However, the scope of PEBB's fiduciary duty is not unfettered. ORS 243.145(1) gives PEBB the discretion to "employ whatever means are reasonably necessary to carry out the purposes of [its enabling statutes]." It is up to PEBB to determine how best to carry out its assumed obligation consistent with the provisions of ORS chapter 243. We reiterate that PEBB is a creature of statute and that its authority is limited to that provided by the statutes and the discretion delegated therein. It is not within the scope of a court's authority to second-guess an agency's discretionary determinations that are consistent with its delegated statutory authority, even if the exercise of discretion might be perceived by the court to be unfair.
In Sundermier's view, PEBB's assumed obligation is best carried out in its discretion by distributing the funds pro rata to the members of the certified class. The difficulty with that view is that PEBB does not consider its obligation to run to the individual members of the class. Rather, it acknowledges that it has an obligation to current PEBB members collectively, a largely different group from employees who were insured by policies on December 17, 1997. We conclude that, despite PEBB's assumed duty to use the funds for the collective benefit of employees, it has no statutory obligation to distribute the funds pro rata. We have already addressed why the statutory provisions governing PEBB and governing demutualization do not require such a distribution. We now consider and dispose of Sundermier's remaining arguments concerning distribution of the demutualization proceeds.
Sundermier contends that both Standard and DCBS contemplated that the group policyholders had an obligation to pass the funds through to the premium payers. That expectation, he contends, is revealed in a memorandum provided to PEBB by Standard's legal department, in which Standard advised that "when an employee pays for all or part of the premium, the policyholder may have a legal obligation to use any consideration received for the benefit of those employees, at least in proportion to the amount they contributed." It is further suggested, Sundermier asserts, by one of the conditions for DCBS's approval of Standard's plan, which required Standard to assist group policyholders, if requested, to identify individual group members, where reasonably feasible to do so.[19] We agree with Sundermier that *1072 both documents suggest that the distribution of demutualization proceeds to individual insureds was contemplated as an option for group policyholders. They do not, however, give rise to a requirement to so distribute the proceeds.
Sundermier contends that PEBB has no authority to retain the demutualization funds and in fact had an affirmative duty to distribute the funds to their rightful owners. That point is premised on Sundermier's mistaken view that (1) the individual employee premium payers own the funds, which we have already rejected, and (2) that there was no account into which the demutualization proceeds could lawfully be deposited, which we also reject. We agree with Sundermier that neither the PEBA nor the rate stabilization fund were appropriate accounts for the demutualization proceeds. However, the legislature has expressly authorized agencies to establish new accounts when no existing account is appropriate. ORS 293.447(1) provides, in part:
"With the consent of and in accordance with rules prescribed by the State Treasurer, agencies may establish accounts with the State Treasurer * * *. These accounts may be established when required by federal law or regulation or when it is impractical for the agency to use funds established with the Oregon Department of Administrative Services."
Thus, upon receipt of the demutualization proceeds, PEBB had express authority to place the proceeds into a special account, with the consent of the State Treasurer. It did so when it deposited the funds in the newly created PEBB Trust Account.
In light of our conclusion that Sundermier has not established that the members of the class have an ownership interest in the demutualization proceeds, we reject without further discussion Sundermier's contention that, to the extent that Oregon law eliminates the insureds' contractual and common-law property interest in the funds, it works a taking in violation of the Fifth Amendment to the United States Constitution and Article I, section 18, of the Oregon Constitution. We reject Sundermier's remaining arguments without discussion.

III. OHSU'S APPEAL
Having determined that the demutualization proceeds do not belong to the members of the certified class, we next address OHSU's appeal, in which it contends that the trial court erred in granting summary judgment to PEBB on OHSU's claims that it is statutorily and contractually entitled to a proportional share of the demutualization proceeds. Our resolution of OHSU's appeal depends primarily on the effect of 1995 legislation transforming OHSU from a state agency to an independent public corporation.
Until July 1, 1995, OHSU was a state agency. Its employees were state employees and participated in benefit programs administered by PEBB. Effective July 1, 1995, legislation established OHSU as an independent public corporation,[20] Or. Laws 1995, ch. 162, and transferred to the newly established entity nearly all assets associated with OHSU's operations as a part of the state university system, including assets that were then commingled.
In its first assignment of error, OHSU contends that, under the terms of the 1995 act, it is entitled to a proportional share of the demutualization funds. OHSU relies on provisions of the 1995 act, which, it explains, were intended to require the transfer to OHSU of all state funds and assets *1073 associated with OHSU as a state agency, including funds managed on or behalf of the former state agency. Section 48 of the 1995 act provides:
"All unexpended moneys, including but not limited to General Fund appropriations, Executive Department Economic Development Fund allocations, gifts, bequests, other funds, assessments, liability and workers' compensation reserves and premiums that are appropriated to, held, managed or invested or otherwise available to any state officer or agency for the purposes of any of its duties, functions or power transferred by this Act to the university, are appropriated and transferred to the university."
Or. Laws 1995, ch. 162, § 48. Section 48 provides for a transfer to OHSU of "unexpended moneys" "that are appropriated to, held, managed or invested or otherwise available to any state officer or agency for the purposes of its duties, functions or power" transferred to OHSU. OHSU contends that that portion of the demutualization proceeds currently held in the PEBB treasury account attributable to OHSU employees' participation in Standard's policies through December 17, 1997, constitutes "unexpended moneys," as described in section 48, that must be transferred or appropriated to OHSU, because those funds were "held, managed or invested * * * or otherwise available to [PEBB] for the purposes of [PEBB's] duties, functions or power" that were transferred to the newly created OHSU. In OHSU's view, section 48 effectively appropriates and transfers to OHSU its proportional share of the demutualization proceeds.
PEBB does not dispute that the demutualization proceeds relate to PEBB's administration of benefit plans for OHSU employees. It responds, however, that the legislature's choice to make section 48 applicable to "unexpended moneys" expresses an intention to transfer to OHSU only those funds that were held and capable of being spent by state agencies on the effective date of the 1995 act, that is, July 1, 1995, and that the demutualization payment received by PEBB in April 1999 does not fall within that intention.
PEBB adds that the legislature's use of the present verb tense in section 48 also indicates an intention that the provisions apply only to funds that the state held on the 1995 act's effective date, and not to funds that would be received in the future. For example, section 48 provides that funds that "are appropriated to, held, managed or invested or otherwise available to" the named entities "are appropriated and transferred to the university." (Emphasis added.)
As the Supreme Court has recognized, the use of a particular verb tense in a statute can be a significant indicator of the legislature's intention. Martin v. City of Albany, 320 Or. 175, 181, 880 P.2d 926 (1994). We agree with PEBB that the legislature's choice of the present verb tense, together with the term "unexpended moneys," suggests an intention that the requirement of section 48 for the transfer funds to OHSU applies only to funds in existence on the 1995 act's effective date.
Another provision of the 1995 act bears discussion, however. Section 10 of the 1995 act provides that PEBB will continue to administer employee benefit plans for OHSU until OHSU adopts a new system or alternative employee benefit plan. Or. Laws 1995, ch. 162, § 10. Pursuant to section 10, PEBB and OHSU entered into an intergovernmental agreement providing for PEBB's continued coverage of OHSU employees in PEBB-administered benefit programs. PEBB retained money in its rate stabilization fund attributable to the administration of benefit plans for OHSU employees and continued to appropriate money to the rate stabilization fund for expenses relating to its administration of OHSU employee benefit plans until OHSU began administering its own employee benefit program.
Section 48 provides that the funds to be transferred to OHSU are the funds "available to any state officer or agency for the purposes of any of its duties, functions or power transferred by this Act to the university * * *." (Emphasis added.) It is undisputed that, consistent with section 10 of the 1995 act, the function of administering employee benefit programs did not transfer from PEBB to OHSU until January 1, 1998. OHSU's continued participation in PEBB after *1074 July 1, 1995, pursuant to section 10, was an express exception to the transfer of functions to OHSU as of July 1, 1995. Because the function of administering benefit plans did not transfer to OHSU until January 1, 1998, there was no authorization under section 48 for a transfer of the funds attributable to that function until January 1, 1998. In other words, funds follow function.
When, however, the function of administering benefit plans for OHSU employees transferred to OHSU, the funds attributable to that function became subject to transfer under section 48. Thus, in June 1998, consistent with section 48, PEBB transferred to OHSU money from its rate stabilization fund attributable to PEBB's administration of employee benefit plans for OHSU employees.
OHSU contends that a proportional share of the demutualization proceeds is similarly attributable to PEBB's function of administering benefit programs for OHSU employees and is appropriated to OHSU under section 48, and we agree. The variable portion of the demutualization proceeds have as their source, in part, the policies that PEBB managed and administered on behalf of OHSU as of December 17, 1997. For that reason, section 48 of the 1995 act "appropriates" those funds to OHSU. The 1995 act specifically provided that it is to be "liberally construed to effect the purposes and intent thereof." ORS 353.035; Or. Laws 1995, ch. 162, § 90. We believe that our understanding of sections 48 and 10 gives effect to the legislature's intention to transfer to OHSU all funds related to functions transferred to OHSU.
In view of our conclusion, we do not address OHSU's contention that PEBB had a contractual obligation to transfer the funds, arising out of the intergovernmental agreement.

IV. CONCLUSION
In summary, we conclude that the individual state employee insureds under Standard group policies administered by PEBB have no ownership interest in demutualization consideration received by PEBB and deposited in a state treasury account and no right to a pro rata distribution. PEBB has the right to retain the funds and no obligation to distribute them to individual state employees, but it must expend those funds consistently with its statutory duties and its assumed responsibility as trustee of the funds for the benefit of PEBB members. We conclude, further, that OHSU is entitled to a proportional share of the demutualization proceeds, and we remand the case to the trial court for a determination of that proportional share.
Reversed and remanded on OHSU's appeal; affirmed on Sundermier's appeal.
NOTES
[*] Brewer, C. J., vice Ceniceros, S. J.
[1] "Demutualization" is the process by which a mutual insurer converts to a stock insurer.
[2] To the extent that the judges of this court have a financial stake in the outcome of this litigation, we invoke the rule of necessity to decide the appeal. See generally Oregon State Police Officers' Assn. v. State of Oregon, 323 Or. 356, 361 n. 3, 918 P.2d 765 (1996) (court invoked "rule of necessity" to decide case involving Public Employees' Retirement Fund in which judges participated).
[3] ORCP 31 A provides, in part:

"Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but adverse to and independent of one another, or that the plaintiff alleges that plaintiff is not liable in whole or in part to any or all of the claimants."
[4] In this opinion, all further references to "Sundermier" are to Sundermier in his capacity as representative of the class.
[5] The trial court dismissed the petition for a writ of mandamus and that ruling is not challenged on appeal.
[6] Effective January 1, 1998, the legislature abolished the State Employee Benefits Board (SEBB) and the Bargaining Unit Benefit Board (BUBB), and created PEBB as their successor. Or. Laws 1997, ch. 222. In this opinion, for the sake of consistency, we refer to both SEBB and PEBB as "PEBB."
[7] ORS 243.165 (1999) provides:

"(1) There hereby is created in the General Fund an account to be known as the Public Employees' Benefit Account, the balances of which are continuously appropriated to cover administrative expenses incurred in connection with the administration of ORS 243.105 to 243.285 and 292.051.
"(2) There hereby is appropriated to the Public Employees' Benefit Account all refunds and dividends from any carrier or contractor because of any agreement or contract entered into between the carrier and the Public Employees' Benefit Board and, subject to ORS 243.185, an amount not to exceed two percent of the monthly state and employee contributions for any benefit available under ORS 243.105 to 243.285 and 292.051."
ORS 243.185 (1999) provides:
"Subject to legislative or Emergency Board approval of budgetary authorization for operation of the Public Employees' Benefit Board and its administration of the health benefit plans and other duties under ORS 243.105 to 243.285 and 292.051, an amount not to exceed two percent of the state and the employee contributions shall be forwarded by each payroll disbursing officer to the board and deposited by it in the State Treasury to the credit of the Public Employees' Benefit Account to meet administrative and other costs authorized by ORS 243.105 to 243.285 and 292.051. However, no such assessment shall be required for any month in which the balance in the account exceeds five percent of the monthly total of state and employee contributions."
In 2001, the legislature amended both ORS 243.165 and ORS 243.185, and also enacted ORS 243.167, creating the Public Employees' Revolving Fund. Or. Laws 2001, ch. 655, §§ 2-4. The parties agree that the 1999 versions of ORS 243.165 and ORS 243.185 control and that ORS 243.167 is not applicable to this case.
[8] A mutual insurer is "an incorporated insurer without capital stock and the governing body of which is elected by the policyholders." ORS 731.142(2). A stock insurer is "an incorporated insurer whose capital is divided into shares and owned by its stockholders." ORS 731.142(1).
[9] ORS 731.162 defines "health insurance" as "insurance of humans against bodily injury, disablement or death by accident or accidental means * * *." Thus, the Standard disability and dismemberment policies are treated as "health insurance" for purposes of the insurance code.
[10] ORS 732.626 provides that the director shall approve the plan if, among other requirements, the plan (1) complies with the provisions of ORS 732.600 to 732.630; (2) protects the rights of policyholders; (3) is fair and equitable to the members and will not prejudice the interest of members; and (4) fairly and equitably allocates consideration among members.
[11] We note that the employee certificates of insurance provide that a person is a "member" of the insured group if the person is an "active employee of the EMPLOYER * * * [r]egularly scheduled to work at least 20 hours each week."
[12] Approximately 20 to 25 percent of the consideration to be distributed by Standard was allocable to eligible members that, like PEBB, were public entities, agencies, departments, boards, commissions, and other instrumentalities that are prohibited from owning common stock. Those eligible members would receive consideration in cash, unless they affirmatively elected to receive stock.
[13] Standard advised PEBB:

"Under both ERISA (private employers) and non-ERISA (public employers and certain others) plans, when an employee pays for all or part of the premium, the policyholder may have a legal obligation to use any consideration received for the benefits of those employees, at least in proportion to the amount they contributed."
[14] In considering the insureds' ownership interests, if any, in the demutualization proceeds, it is tempting to find analogies in cases decided under the Employee Retirement Income Security Act (ERISA), 29 USC § 1001, but, as the parties agree, "government plans" are expressly exempt from ERISA, 29 USC § 1003(b)(1), and ERISA's distinct provisions do not apply here.
[15] Compare ORS 238.640(5), under which all members of the Public Employees Retirement Board "have the same fiduciary duties and must exercise the same degree of independent judgment."
[16] Compare ORS 238.601 and ORS 238.660 (describing duties of Public Employees Retirement Board, as trustee of Public Employees Retirement Fund). ORS 238.660(1) provides:

"Consistent with the legislative intent expressed in ORS 238.601, and to the extent it is consistent with the board's fiduciary duties, the board shall give equal consideration to the interests of participating public employers and the interests of members. Nothing in this subsection shall be construed to impose a fiduciary duty on the board to consider the interests of public employers, and the board shall consider the interests of public employers only with respect to matters unrelated to the board's fiduciary duties as trustee of the fund."
[17] We note that ORS 744.730(1), relating to third-party administrators of insurance policies, indicates that the third-party administrator functions as a fiduciary to the insurer:

"A third party administrator shall hold in a fiduciary capacity all insurance charges or premiums collected by the third party administrator on behalf of or for an insurer, and all return premiums received from the insurer."
However, employer third-party administrators are exempt from that provision. ORS 744.704(1)(c).
[18] As previously noted, the Public Employees' Revolving Fund, ORS 243.167, was not in existence at the relevant time.
[19] The order provided:

"Standard will assist group policy and annuity holders, group administrators and other similar persons or entities, if requested by such entities, by providing data, information and technical assistance readily available to Standard, to assist groups to identify individual group members and determine the value of the actuarial contribution of such individual group members, where reasonably feasible to do so."
[20] ORS 353.020 provides:

"Oregon Health and Science University is established as a public corporation and shall exercise and carry out all powers, rights and privileges that are expressly conferred upon it, are implied by law or are incident to such powers. The university shall be a governmental entity performing governmental functions and exercising governmental powers. The university shall be an independent public corporation with statewide purposes and missions and without territorial boundaries. The university shall be a governmental entity but shall not be considered a unit of local or municipal government or a state agency for purposes of state statutes or constitutional provisions."